In the MATTER OF the MENTAL COMMITMENT OF
HELEN E. F.:

FOND DU LAC COUNTY, Petitioner-Respondent,†

v.

HELEN E. F., Respondent-Appellant.

Court of Appeals

*No. 2010AP2061. Submitted on briefs December 8, 2010.
—Decided April 27, 2011.*

2011 WI App 72

(Also reported in 798 N.W.2d 707.)

† Petition for Review Filed.

On behalf of the respondent-appellant, the cause was submitted on the briefs of *Donald T. Lang*, assistant state public defender, Madison.

On behalf of the petitioner-respondent, the cause was submitted on the brief of *William J. Bendt* of *Fond du Lac County Corporation Counsel*, Fond du Lac.

Nonparty briefs were filed by *Maren Beermann* of *Coalition of Wisconsin Aging Groups,* Madison; *Andrew T. Phillips* and *Daniel J. Borowski* of *Phillips Borowski, S.C.,* Mequon, for Wisconsin Counties Association; and *Kristin M. Kerschensteiner* of *Disability Rights Wisconsin,* Madison.

Before Brown, C.J., Anderson and Reilly, JJ.

¶ 1. ANDERSON, J. Helen E. F. appeals from an order for commitment and an order for involuntary medication. The evidence presented at trial was insufficient to sustain Helen's WIS. STAT. ch. 51 (2009–10)[1] involuntary commitment as a matter of law given that Helen, who is afflicted with Alzheimer's disease, does not suffer from a qualifying mental condition and is not a proper subject for treatment. We therefore reverse and remand the orders and instruct the trial court to proceed not inconsistently with this opinion.

### Standard of Review

¶ 2. Construction of a statute is a question of law. As to questions of law, this court is not required to give special deference to the trial court's determination. *Hucko v. Joseph Schlitz Brewing Co.*, 100 Wis. 2d 372, 376, 302 N.W.2d 68, 71 (Ct. App. 1981). When interpreting a statute, we begin with the language of the statute. *State ex rel. Kalal v. Circuit Court for Dane Cnty.*, 2004 WI 58, ¶ 45, 271 Wis. 2d 633, 681 N.W.2d 110. We give words their common and ordinary meaning unless those words are technical or specifically defined. *Id.* We do not read the text of a statute in isolation, but look at the overall context in which it is used. *Id.*, ¶ 46. When looking at the context, we read the text "as part of a whole; in relation to the language of surrounding or closely related statutes; and reasonably, to avoid absurd or unreasonable results." *Id.* Thus, the scope, context, and purpose of a statute are relevant to a plain-meaning interpretation "as long as the scope, context, and purpose are ascertainable from the text and structure of

---

[1] All references to the Wisconsin Statutes are to the 2009–10 version unless otherwise noted.

the statute itself." *Id.*, ¶ 48. If the language is clear and unambiguous, we apply the plain words of the statute and ordinarily proceed no further. *Id.*, ¶ 46.

¶ 3. The inquiry does not stop if a statute is ambiguous, meaning that "it is capable of being understood by reasonably well-informed persons in two or more senses." *Id.*, ¶ 47. If a statute is ambiguous, we may turn to extrinsic sources. *Id.*, ¶ 51. Extrinsic sources are sources outside the statute itself, including the legislative history of the statute. *Id.* We sometimes use legislative history to confirm the plain meaning of an unambiguous statute, but we will not use legislative history to create ambiguity where none exists. *Id.*

*Facts*

¶ 4. The facts are not in dispute. Helen is an eighty-five-year-old woman with Alzheimer's dementia. Her condition has regressed to the point that "she is very limited in any verbal communication." Helen's appearance at the proceedings in this case was waived because "she would not understand or comprehend or be able to participate meaningfully."

¶ 5. *Motion to Dismiss:* Prior to the probable cause hearing on May 18, 2010, Helen's attorney moved the court to dismiss the Wis. Stat. ch. 51 proceeding. In support of the motion, Helen's attorney outlined the procedural history of Helen's confinement.

¶ 6. Helen's attorney explained that Helen was taken to St. Agnes Hospital on April 12, 2010. On April 15, 2010, a probable cause hearing was conducted on a prior Wis. Stat. ch. 51 petition. Following this hearing, the court commissioner concluded there was not sufficient probable cause to proceed. At that point, the ch. 51

petition was converted to a WIS. STAT. ch. 55 protective placement action and a thirty-day temporary guardianship was issued.

¶ 7. The thirty-day-time period to proceed with the WIS. STAT. ch. 55 protective placement expired on May 15 and a second WIS. STAT. ch. 51 petition was filed. Helen's attorney argued that contrary to the teaching of *State ex rel. Sandra D. v. Getto*, 175 Wis. 2d 490, 498 N.W.2d 892 (Ct. App. 1993), the filing of this new ch. 51 petition constituted an impermissible attempt "to circumvent this time limit." Counsel argued the new ch. 51 petition must be dismissed, because "[y]ou can't keep detaining and detaining and detaining an individual once that time period has expired."

¶ 8. Insisting that the new WIS. STAT. ch. 51 proceeding was the product of "a separate petition," Fond du Lac County argued that Helen "hasn't been detained continuously under the old order" because after the thirty-day-time period expired for the WIS. STAT. ch. 55 protective placement action and a thirty-day temporary guardianship, "she was wheeled off the unit, and then she was brought back on." The County argued that because she was off the unit, that ended the thirty-day order and therefore, "[t]his [was] a new detention." When pressed as to how long Helen was "wheeled off the unit," the County responded:

> She was off the unit. It doesn't matter how long she was off the unit. She was off the unit. And that ended the 30–day order. This is a new detention. This is a new detention. It doesn't matter if it's two seconds; it split in two, it is not continuous.

¶ 9. The County further defended the filing of the second WIS. STAT. ch. 51 petition, maintaining it was based on new information since the prior ch. 51 petition was dismissed. According to the County, at the time the

prior ch. 51 petition was dismissed, it appeared that Helen's disruptive behavior was the product of a medical problem, i.e., a urinary tract infection. The County argued that inasmuch as Helen's disruptive behavior has continued even after this medical condition was treated, it now appears that Helen's disruptive behavior is the product of her dementia. The County further argued:

> [Y]ou can have a [WIS. STAT. ch.] 51 on someone with dementia, in that dementia is treatable in some way and this one is treated. She is not going to get cognitively better, but it's going to improve or control the aggressiveness, the physical aggressiveness that she is showing . . . .

Helen's attorney maintained the position that the filing of a new WIS. STAT. ch. 51 petition constituted an end run around the government's failure to comply with the time limits of a prior WIS. STAT. ch. 55 proceeding. The trial court denied Helen's motion to dismiss without explanation: "I'll deny your motion."

¶ 10. *Probable cause hearing.* During the probable cause hearing that immediately followed the court's denial of Helen's motion to dismiss, the County presented testimony from psychiatrist Dr. Brian Christenson. Christenson treated Helen during her initial WIS. STAT. ch. 51 emergency detention at St. Agnes on April 12, 2010, and throughout the subsequent thirty-day WIS. STAT. ch. 55 emergency placement order. In Christenson's opinion, Helen suffers from "[s]enile dementia of Alzheimer's type." Christenson explained that this "progressive loss of brain function, brain deterioration" is exhibited in the following ways:

> [S]he is extremely confused and forgetful and disoriented and agitated, aggressive, uncooperative, anxious, incontinent, and unable to carry on conversations; it grossly impaired her judgment and she is unable to make any decisions regarding her own self care.

Christenson was "not certain" whether Helen's agitation and aggressiveness was related to the dementia or the urinary tract infection, but believed it was "most likely predominantly from the dementia."

¶ 11. With regard to whether Helen's dementia was subject to treatment, Christenson indicated "the cognitive deterioration is not treatable, but the psychiatric complications of her dementia are treatable," in that "her agitation, aggressiveness, combativeness can be treated with medications that can have some calming effects." Helen is "completely unable to understand" the advantages and disadvantages of the medication. In Christenson's opinion, Helen poses a danger to herself and others through her combativeness with treatment staff and "could harm herself inadvertently."

¶ 12. Christenson noted that when Helen was taken off the unit at St. Agnes, he "[did not] think she was placed anywhere." Further, Christenson acknowledged that Helen was off the unit "[n]ot very long" and that he believed she was wheeled off the unit because of a problem with the expiration of the WIS. STAT. ch. 55 thirty-day-time period. The court found sufficient probable cause to proceed.

¶ 13. *Final commitment hearing.* The final commitment hearing was conducted on May 28, 2010. The sole witness at the hearing, psychiatrist Dr. Robert Rawski, testified that Helen "suffers from Alzheimer's Dementia with a behavioral disturbance," that Helen "has progressive dementia" and "has been in a nursing home for the last six years." Rawski explained that Helen's "dementia has progressed to the point where she is very limited in any verbal communication" and she is "so cognitively impaired by her dementia" that she is unable to express an understanding of the advantages or disadvantages of medication.

¶ 14. Rawski further explained that Alzheimer's dementia can involve behavioral disturbances such as "poor judgment, aggression towards others, periods of agitation [and] wandering." And that "[c]ognitively, [dementia] is not considered to be a treatable mental disorder. It's a progressive mental defect that is not treatable." Rawski indicated, however, that the behavioral disturbances resulting from dementia are subject to treatment. He said that treatment consists of using medications to address impulsivity, agitation, and physical combativeness.

¶ 15. Rawski testified that it was his opinion that Helen poses a risk of harm to others due to her impulsive combativeness and grabbing of treatment staff. Rawski said he believed, due to "her advanced age, medical issues, and dementia," Helen also poses a risk of harm to herself because she is unable to manage her daily needs. Based on Rawski's testimony, the trial court found that the grounds for a WIS. STAT. ch. 51 commitment and an involuntary medication order had been proven by clear and convincing evidence. A ch. 51 commitment order and an involuntary medication order were entered following the bench trial. Helen appeals both orders.

*The Alzheimer's*
*Challenging Behaviors Task Force Report[2]*

¶ 16. We begin by noting that the issues raised in this case are of great public import. The number of people aged sixty-five or older with Alzheimer's disease

---

[2] *See Handcuffed: A Report of the Alzheimer's Challenging Behaviors Task Force,* http://www.planningcouncil.org/PDF/Alzheimers_Report_Handcuffed.pdf (last visited Apr. 17, 2011). For readability, we do not repeatedly cite to the link to our source. However, the discussion and facts are all derived from the task force report unless otherwise noted.

is expected to reach 7.7 million in 2030 from the current 5.3 million. Nearly one out of two people who reach age eighty-five will develop Alzheimer's. In Wisconsin alone, the current number of people with Alzheimer's is estimated at 110,000. All too often, instead of engaging in behavioral management techniques or careful discharge planning, facilities will use WIS. STAT. ch. 51 civil commitment procedure to immediately remove residents with challenging behaviors, many of whom suffer from Alzheimer's disease.

¶ 17. One way to measure the greatness of our society is to look at how we treat our weakest members, such as our growing population of people afflicted with Alzheimer's.[3] In April 2010, the Alzheimer's Challenging Behaviors Task Force was called together by the Alzheimer's Association of Southeastern Wisconsin to look into the treatment of people with Alzheimer's. The task force was called together following the tragic death of Richard Petersen. Petersen, an eighty-five-year-old gentleman with late stage dementia who exhibited challenging behaviors, was placed under emergency detention after being at two hospitals, and was eventually transferred by police to the Milwaukee County Behavioral Health Division where his family found him tied in a wheel chair with no jacket or shoes. In spite of his family's efforts to intervene, he later developed pneumonia, was transferred to a hospital, and died. The

---

[3] A similar sentiment is often attributed to Mohandas Karamchand Gandhi (2 Oct. 1869–30 Jan. 1948), commonly known as Mahatma Gandhi: "A nation's greatness is measured by how it treats its weakest members." http://www. biography. com/articles/Mahatma-Gandhi-9305898 (last visited Apr. 14, 2011); Timothy A. Kelly, *Healing the Broken Mind: Transforming* America's Failed Mental Health System 1 (N.Y. University Press 2009).

Alzheimer's Association and scores of members of the community were deeply concerned, not only about the treatment of Mr. Petersen and his family, but about others in the Milwaukee county area that are in the same or similar circumstances. The Alzheimer's Association sought and obtained support from several charitable foundations to partner with the Planning Council for Health and Human Services, Inc., to staff a task force and produce a report to the community.

¶ 18. The task force found that using WIS. STAT. ch. 51 as a vehicle to deal with challenging behaviors in persons with dementia can lead to transfer trauma, medical complications, exacerbated behaviors, and even death. The use of ch. 51 emergency detentions and the administration of psychotropic drugs, though common, are controversial strategies used to deal with challenging behaviors among people with Alzheimer's and related dementias.[4] These two controversial strategies are precisely what were used to deal with Helen's challenging behaviors.

¶ 19. While WIS. STAT. ch. 51 provides a means to place persons with mental illness who are considered to be a danger to themselves or others in emergency

---

[4] Other strategies that are used to deal with challenging behaviors among people with Alzheimer's and related dementias reflect promising practices, including activities and interventions that incorporate the interaction of the person with dementia, the caregiver and the environment in which the behaviors occur. These include formal support for caregivers, training in promising methods of assessment and intervention, a culture shift toward "person-centered" care, pain management, use of the Star Method, and instituting appropriate policies and guidelines within facilities regarding the management of challenging behaviors among people with Alzheimer's disease and other dementias.

detention and to administer involuntary treatment, the task force found that a ch. 51 petition is often used for persons with Alzheimer's and related dementias. It found that the usual treatment is the involuntary administration of psychotropic drugs to reduce agitation and aggression and produce a state of sedation. "People come to us in handcuffs, they are out of their milieu, they are put on someone else's schedule, put on meds, and are surrounded by chaos. This will worsen their situation. If they weren't confused before, they will be now."

¶ 20. Finally, the task force found that across Wisconsin, there is variation in the way different counties apply WIS. STAT. ch. 51 to people who have Alzheimer's and related dementias. At least two counties do not believe ch. 51 should apply to this population and will not prosecute older adults with dementia under ch. 51.

### Discussion and Law

¶ 21. Helen's case provides the opportunity to clarify the proper application of WIS. STAT. ch. 51 and eliminate the variation in ways counties apply the law to people who have Alzheimer's and related dementias.

¶ 22. Our consideration of the law and the parties' arguments, as well as the well-written amicus briefs[5] and task force report, lead us to conclude that Helen was not a proper subject for detainment or treatment under WIS. STAT. ch. 51 because Alzheimer's disease is not a qualifying mental condition under that chapter.

---

[5] We are grateful to Disability Rights Wisconsin, Coalition of Wisconsin Aging Groups, and Wisconsin Counties Association for the very helpful and well-written briefs, pertinent parts of which we track in this opinion.

¶ 23. Both Wis. Stat. chs. 51 and 55 define "degenerative brain disorder" as the "loss or dysfunction of brain cells to the extent that the individual is substantially impaired in his or her ability to provide adequately for his or her own care or custody or to manage adequately his or her property or financial affairs." Wis. Stat. §§ 55.01(1v) & 51.01(4r). Wisconsin Stat. ch. 46 specifically defines Alzheimer's disease as "a *degenerative disease* of the central nervous system characterized especially by premature senile mental deterioration, and also includes any other irreversible deterioration of intellectual faculties with concomitant emotional disturbance resulting from organic brain disorder." Wis. Stat. § 46.87(1)(a) (emphasis added). Thus, looking at the text of these closely related statutes, we are able to ascertain that Alzheimer's disease is simply one type of a degenerative brain disorder. *See Kalal,* 271 Wis. 2d 633, ¶ 46.

¶ 24. We further conclude that the intended application of the term "degenerative brain disorder" in Wis. Stat. chs. 51 and 55 is unambiguous. Chapter 51's definition of the term is included only to specifically *exclude* it from the chapter's authority, whereas ch. 55's definition is used to *include* it in the scope of authority granted under ch. 55's protective placement and services laws. In ch. 51, "degenerative brain disorder" is referred to only as an exception to both the definitions of "developmental disability" and "serious and persistent mental illness." Wis. Stat. § 51.01(5)(a) & (14t). Chapter 51's definition of "mental illness" is silent on the term "degenerative brain disorder," and defines "mental illness" for purposes of involuntary commitment as "a substantial disorder of thought, mood, perception, orientation, or memory which grossly impairs judgment, behavior, capacity to recognize reality,

752

or ability to meet the ordinary demands of life, but does not include alcoholism." Sec. 51.01(13)(b).

¶ 25. Accordingly, it would be inconsistent to include "degenerative brain disorder" in this statutory definition. Even though the definition of "mental illness" does not specifically exclude the term "degenerative brain disorder," "degenerative brain disorder" is specifically statutorily defined separately from "mental illness," thereby creating an intentional distinction between the two terms.

¶ 26. Contrary to WIS. STAT. ch. 51, WIS. STAT. ch. 55 specifically *includes* individuals with degenerative brain disorders when defining the scope of who may receive protective services and for whom emergency and temporary protective placements may be made. WIS. STAT. §§ 55.01(6r)(k), 55.135(1). Even more telling is each respective statutory section's initial statement of legislative policy. Chapter 51 states that "[i]t is the policy of the state to assure the provision of a full range of treatment and rehabilitation services in the state for all mental disorders and developmental disabilities and for mental illness, alcoholism and other drug abuse." WIS. STAT. § 51.001. Chapter 55 explains that "[t]he legislature recognizes that many citizens of the state, because of serious and persistent mental illness, *degenerative brain disorder,* developmental disabilities, or other like incapacities, are in need of protective services or protective placement." WIS. STAT. § 55.001 (emphasis added). Notably and repeatedly absent from ch. 51 is the term "degenerative brain disorders" and, just as notably, the term is specifically included throughout ch. 55. *See Kansas v. Hendricks,* 521 U.S. 346, 359 (1997) ("[W]e have traditionally left to legislators the task of defining terms of a medical nature that have legal significance.").

¶ 27. Moreover, the primary purpose of Wis. Stat. ch. 51 is to provide treatment and rehabilitation services for the individuals described in ch. 51's legislative policy. Wis. Stat. § 51.001. Even if we were to assume, which we do not, that Alzheimer's disease could reasonably be classified under ch. 51's definition of "mental illness," commitment of an individual with Alzheimer's disease under ch. 51 is nonetheless not appropriate because Alzheimer's disease falls outside the scope of ch. 51's limited definition of "treatment." "Treatment" is defined by ch. 51 as "those psychological, educational, social, chemical, medical or somatic techniques designed to bring about rehabilitation of a mentally ill, alcoholic, drug dependent or developmentally disabled person." Wis. Stat. § 51.01(17).

¶ 28. Consequently, rehabilitation is a necessary element of treatment under Wis. Stat. ch. 51. Because there are no techniques that can be employed to bring about rehabilitation from Alzheimer's, an individual with Alzheimer's disease *cannot* be rehabilitated. Accordingly, Helen is not a proper subject for ch. 51 treatment. *See Alzheimer's Association, 2010: Alzheimer's Disease Facts and Figures,* http://www. alz.org/documents_custom/report_alzfactsfigures 2010. pdf, 8 (last visited Apr. 8, 2011).

¶ 29. Though we could end here, we consider it relevant to note that this court has in fact distinguished the term "rehabilitation" from "habilitation" in a similar Wis. Stat. ch. 51 context. *See Milwaukee Cnty. Combined Cmty. Servs. Bd. v. Athans,* 107 Wis. 2d 331, 334–35, 320 N.W.2d 30 (Ct. App. 1982). In *Athans,* Milwaukee County Combined Community Services Board petitioned the trial court for the involuntary commitment of Theodora Athans and Gerald Haskins pursuant to Wis. Stat. § 51.20. *Athans,* 107 Wis. 2d at 332. The trial court found

Athans mentally ill and evincing a danger to herself, but not a proper subject for treatment. *Id.* at 333. The trial court found Haskins developmentally disabled, but not a proper subject for treatment. *Id.* The trial court ordered both petitions dismissed. *Id.*

¶ 30. The Board appealed, arguing that we should broadly construe the term rehabilitation to include within it habilitation in order to carry out the intent of the legislature as embodied in Wis. Stat. ch. 51. *Athans,* 107 Wis. 2d at 335. We determined that "[o]nly if rehabilitation includes habilitation may we say that Athans and Haskins are proper subjects for treatment." *Id.* The two issues on appeal then were (1) whether treatment as defined in Wis. Stat. § 51.01(17) includes habilitation as well as rehabilitation and (2) whether the findings of the trial court are against the great weight and clear preponderance of the evidence. *Athans,* 107 Wis. 2d at 335.

¶ 31. In order to determine whether Wis. Stat. ch. 51 treatment included "habilitation" as well as "rehabilitation," we looked to the definitions given by and agreed upon by the two testifying doctors. *Athans,* 107 Wis. 2d at 334, 336. "Habilitation" means "the maximizing of an individual's functioning and the maintenance of the individual at that maximum level." *Id.* at 334. "Rehabilitation" means "returning an individual to a previous level of functioning which had decreased because of an acute disorder." *Id.* We then concluded that "rehabilitation is not an ambiguous term with two or more meanings of which one meaning might include habilitation." *Id.* at 335. We held that because Wis. Stat. § 51.01(17) defines treatment in terms of rehabilitation *only* and because the terms habilitation and rehabilitation are separate and distinct in their meanings, Athans and Haskins— *who were unable to be rehabilitated*—were therefore not suitable for ch. 51 treatment. *Athans,* 107 Wis. 2d at 335–37.

¶ 32. *Athans* is very much on point. Like Athans and Haskins, Helen has a condition that cannot be rehabilitated; thus, like Athans and Haskins, Helen is not suitable for WIS. STAT. ch. 51 treatment. *See Athans*, 107 Wis. 2d at 335–37.

¶ 33. Finally, the legislative scheme concerning involuntary civil commitment supports our holding today, just as strongly as it supported our holding in *Athans*. *See id.* at 337. WISCONSIN STAT. ch. 51 provides for active treatment for those who are proper subjects for treatment, while WIS. STAT. ch. 55 provides for residential care and custody of those persons with mental disabilities that are likely to be permanent. *See Athans*, 107 Wis. 2d at 337. With the ever-growing Alzheimer's population, "[t]he distinction between these two statutes must be recognized and maintained." *See id.*

¶ 34. Helen is not a proper subject for treatment under WIS. STAT. ch. 51. We therefore reverse the orders and remand with instructions to proceed not inconsistently with this opinion.[6]

*By the Court.*—Orders reversed and cause remanded with directions.

---

[6] The appellants also argued that the trial court lacked competency to proceed. We need not reach this argument given our holding. *See Walgreen Co. v. City of Madison*, 2008 WI 80, ¶ 2, 311 Wis. 2d 158, 752 N.W.2d 687 (noting that when resolution of one issue is dispositive, we need not reach other issues raised by the parties).

We also leave for another day the question of what is proper under the law when a person has a duel diagnosis of Alzheimer's and a WIS. STAT. ch. 51 qualifying illness.