In the MATTER OF THE MENTAL COMMITMENT OF
HELEN E. F.:

FOND DU LAC COUNTY,
Petitioner-Respondent-Petitioner,

v.

HELEN E. F.,
Respondent-Appellant.†

Supreme Court

*No. 2010AP2061. Oral argument December 2, 2011.
—Decided May 18, 2012.*

2012 WI 50

(Also reported in 814 N.W.2d 179.)

† Motion for reconsideration denied 7/2/12.

500

For the petitioner-respondent-petitioner there were briefs filed and oral argument by *William J. Bendt*, corporation counsel.

For the respondent-appellant, there was a brief and oral argument by *Donald T. Lang*, assistant state public defender.

An amicus curiae brief was filed by *Dawn N. Klockow*, Chilton and *Ryan O'Rourke*, Manitowoc, for the Wisconsin Association of County Corporation Counsels; *Maren Beermann*, Madison, for the Coalition of Wisconsin Aging Groups and *Tom Hlavacek*, Milwaukee, for the Alzheimer's Association of Southeastern Wisconsin; *Kristin M. Kerschensteiner*, Madison, for Disability Rights Wisconsin; *Carol J. Wessels* and *Nelson, Irvings & Waeffler, S.C.*, Wauwatosa, and *Peter E. Grosskopf* and *Grosskopf & Black LLC*, Eau Claire, for the Elder Law Section of the State Bar of Wisconsin and the Wisconsin Chapter of the National Academy of Elder Law Attorneys; and *Andrew T. Phillips, Daniel J. Borowski, Patrick C. Henneger* and *Phillips Borowski, S.C.*, Mequon, for the Wisconsin Counties Association.

¶ 1. MICHAEL J. GABLEMAN, J. We review a published decision of the court of appeals[1] reversing an order of the circuit court for Fond du Lac County, Richard J. Nuss, Judge.

¶ 2. We are asked to decide whether Helen E.F. ("Helen") may be involuntarily committed under Wis. Stat. ch. 51 (2009–10).[2] After reviewing chs. 51 and 55, we hold that Helen is more appropriately treated under the provisions provided in ch. 55 rather than those in ch. 51. Because Helen's disability is likely to be permanent, she is a proper subject for protective placement and services under ch. 55, which allows for her care in

---

[1] *Fond du Lac County v. Helen E.F.*, 2011 WI App 72, 333 Wis. 2d 740, 798 N.W.2d 707.

[2] All subsequent references to the Wisconsin Statutes are to the 2009–10 version unless otherwise indicated.

a facility more narrowly tailored to her needs, and which provides her necessary additional process and protections. We conclude that Helen is not a proper subject for treatment because while her Alzheimer's Disease may be managed, she is not medically capable of rehabilitation, as required by the chapter. For these reasons, we agree with the court of appeals that Helen was improperly committed under ch. 51 and we therefore affirm.

## I. FACTS AND PROCEDURAL HISTORY

¶ 3. The facts of this case are undisputed. Helen E.F. ("Helen") is an 85–year-old woman who resided in a Fond du Lac, Wisconsin nursing home for six years prior to the commencement of this action. She suffers from Alzheimer's Disease,[3] and her symptoms include progressive dementia, memory loss, the inability to learn new information, and limited verbal communication.

¶ 4. Helen began exhibiting aggressive behavior in early April 2010. This behavior included agitation and aggression manifested by striking out at caregivers while toileting, dressing, and bathing, and refusing both meals and medication. On April 12, 2010, Helen was transported to the St. Agnes Hospital emergency room in the city of Fond du Lac for medical treatment. While receiving treatment at the emergency room,

---

[3] Alzheimer's Disease is a "neurodegenerative disorder characterized by . . . neuropathologic changes." Edward T. Bope & Rick D. Kellerman, *Conn's Current Therapy* 901 (2011). In other words, the disease is a "progressive, irreversible brain disorder that robs those who have it of memory and overall mental and physical function, and eventually leads to death." Christopher I. Wright, et al., *Massachusetts General Hospital Comprehensive Clinical Psychiatry* 234 (Theodore A. Stern, et al., ed. 2008).

Helen continued to exhibit the same behaviors that she had exhibited in the nursing home—agitation and aggression.

¶ 5.   Due to Helen's behavior, a Fond du Lac police officer placed her in the hospital's behavioral health unit under emergency detention pursuant to Wis. Stat. § 51.15, and Fond du Lac County ("County") initiated a ch. 51 proceeding to involuntarily commit her for treatment. At the statutorily required probable cause hearing 72 hours[4] later, on April 15, 2010, a court commissioner concluded that no probable cause existed to proceed under ch. 51. The court commissioner then converted the ch. 51 petition to a ch. 55 protective placement action and issued an order for a 30–day protective placement.[5]

¶ 6.   On May 15, 2010, the day the 30–day time period to proceed with a Wis. Stat. ch. 55 placement expired, the County filed a second ch. 51 petition. At the preliminary (probable cause) hearing for this second ch. 51 petition, the circuit court heard testimony from Dr. Brian Christenson, who treated Helen during her 30–day ch. 55 emergency placement at the St. Agnes Behavioral Health Unit. In the course of testifying about Helen's condition, Dr. Christenson stated that he believed that Helen suffered from "senile dementia of the Alzheimer's type," more commonly known as Alzheimer's Disease. Additionally, Dr. Christenson testified that Helen's "cognitive deterioration is not treatable . . . ."

¶ 7.   At the final commitment hearing[6] on the second Wis. Stat. ch. 51 petition, the circuit court heard testimony from Dr. Robert Rawski, one of two physi-

---

[4] *See* Wis. Stat. § 51.20(7)(a).

[5] *See* Wis. Stat. § 51.20(7)(d).

[6] *See generally* Wis. Stat. § 51.20(10).

cians who had been appointed by the circuit court to examine Helen.[7] Dr. Rawski testified that although Helen suffered from Alzheimer's Disease, which "is not considered to be a treatable mental disorder," he believed Helen was a proper subject for treatment because her behavioral disturbances were controllable through medications.

¶ 8. Based on Dr. Rawski's uncontroverted testimony, the circuit court found that Helen was a proper subject for involuntary commitment under Wis. Stat. ch. 51, and granted the petition for Helen's involuntary commitment for up to six months in a locked psychiatric unit.

¶ 9. Helen appealed, and the court of appeals reversed and remanded the cause to the circuit court. *Fond du Lac County v. Helen E.F.*, 2011 WI App 72, ¶ 34, 333 Wis. 2d 740, 798 N.W.2d 707. The court of appeals determined, inter alia, that the primary purpose of Wis. Stat. ch. 51 is to provide treatment, and because Alzheimer's Disease does not respond to treatment, involuntary commitment under ch. 51 was inappropriate. *Id.,* ¶ 27. Accordingly, the court of appeals determined that Helen was not a proper subject for treatment under ch. 51. *Id.,* ¶ 1. The County petitioned this court for review, which we granted on August 31, 2011.

## II. STANDARD OF REVIEW

¶ 10. This case requires us to construe specific provisions of Wis. Stat. ch. 51. The interpretation of a

---

[7] *See* Wis. Stat. § 51.20(9)(a). Pursuant to § 51.20(9)(a), the circuit court appointed Dr. Rawski and Dr. Sangita Patel. Although Dr. Patel provided a written report, she did not provide testimony at the final commitment hearing.

statute is a question of law that we review de novo. *Hocking v. City of Dodgeville*, 2010 WI 59, ¶ 17, 326 Wis. 2d 155, 785 N.W.2d 398. We interpret statutes independently, but benefit from both our prior analyses and those of prior courts. *State v. Henley*, 2010 WI 97, ¶ 29, 328 Wis. 2d 544, 787 N.W.2d 350.

## III. DISCUSSION

¶ 11.  The legislature has consistently demonstrated its concern for the protection of individuals suffering from mental infirmities. This is the announced legislative purpose of two chapters of the Wisconsin statutes: Chapter 51, the "Mental Health Act," and Chapter 55, the "Protective Service System." *See* Wis. Stat. § 51.001(1) ("It is the policy of the state to assure the provision of a full range of treatment and rehabilitation services . . . ."); § 55.001 ("This chapter is designed to establish . . . protective services and protective placements, [and] to assure their availability to all individuals when in need of them . . . ."). The existence of these two different chapters demonstrates that the legislature has created two separate and distinct avenues by which counties may provide medical placement and services to those persons who, because of some disability, are "impaired" in their daily lives and unable obtain such services for themselves.

¶ 12.  In constructing these two avenues, the legislature also established strict rules and boundaries for the provision of care to disabled individuals, demonstrating its commitment "to plac[ing] the least possible restriction on personal liberty and [on the] exercise of constitutional rights consistent with due process." Wis. Stat. § 55.001; *see also* § 51.001(2) (voicing concern for the personal liberties of those committed under ch. 51).

These rules, set forth in chs. 55 and 51, require that counties must commit or place individuals in institutions in accordance with the individual's specific situation, rather than choosing which chapter to apply in a given case. Accordingly, we begin our analysis by reviewing both chs. 55 and 51 to determine which contains the mechanisms most suited to Helen's condition.

## A. CHAPTERS 55 AND 51

¶ 13. Wis. Stat. ch. 55 provides Helen with the best means of care. This is so because ch. 55 was specifically tailored by the legislature to provide for long-term care of individuals with incurable disorders, while ch. 51 was designed to facilitate the treatment of mental illnesses suffered by those capable of rehabilitation. To demonstrate why ch. 55 provides the most appropriate statutory framework for treating individuals such as Helen, we begin with an overview of its procedures, which provide for both protective placement and services.

¶ 14. Beginning with protective placement, Wis. Stat. § 55.08 requires that a circuit court determine that four elements are met before ordering a protective placement under ch. 55. The individual to be protected must: 1) have "a primary need for residential care and custody"; 2) be "an adult who has been determined to be incompetent by a circuit court"; 3) be "so totally incapable of providing for . . . her own care or custody as to create a substantial risk of serious harm to . . . herself" because of "a developmental disability, degenerative brain disorder, serious and persistent mental illness, or other like incapacit[y]"; and 4) have "a disability that is permanent or likely to be permanent." § 55.08(1)(a-d).

¶ 15. Similarly, in order to be eligible for protective services, a circuit court must determine that the following elements are met. First, the individual must be "determined to be incompetent by a circuit court." Wis. Stat. § 55.08(2)(a). Second, the circuit court must determine that "[a]s a result of developmental disability, degenerative brain disorder, serious and persistent mental illness, or other like incapacities, the individual will incur a substantial risk of physical harm or deterioration or will present a substantial risk of physical harm to others if protective services are not provided." § 55.08(2)(b).

¶ 16. These elements must be stated in a petition for protective services or protective placement filed by the county with the circuit court. *See* Wis. Stat. § 55.075. Upon filing, the petitioner must provide notice to the individual to be protected, as well as to that individual's guardian, if one exists. § 55.09(1–2). If the individual has no guardian, the court must appoint a *guardian ad litem* ("GAL") on behalf of the individual.[8] § 55.10(4)(b).

¶ 17. Except in the case of emergency services, the circuit court must hold a hearing to determine whether the four elements for protective placement and two elements for protective services are met by clear and convincing evidence. Wis. Stat. § 55.10(4)(d); *see*

---

[8] Because one of the required elements for both protective placement and services under Wis. Stat. § 55.08(1) is a finding by the circuit court that the individual in need of protective services is incompetent, the requirements of §§ 54.01(16) and 54.10(3) apply. Therefore, it is impossible under the current statutory scheme for an individual to be subject to protective placement or services under ch. 55 without the benefit of a *guardian ad litem*. *See* § 55.10(4)(b); *see also* §§ 54.10(3); 54.40(1).

*also* § 55.08. At this hearing, the circuit court may take testimony from the individual or individuals assigned to conduct the required comprehensive analysis of the individual to be protected. *See* § 55.11. At the conclusion of the hearing, the court may order a protective placement and services at a "nursing home[], public medical institution[] . . . or [at] [an]other appropriate facilit[y]," but may not order placement at "units for the acutely mentally ill." § 55.12(2). The circuit court may, however, order protective placement in a "locked unit" if the court makes a specific finding determining that such placement is necessary. *Id.*

¶ 18. While protective services are ongoing, the protected individual may be subject to the involuntary administration of psychotropic medication if "the individual will incur a substantial probability of physical harm, impairment, injury, or debilitation or will present a substantial probability of physical harm to others." Wis. Stat. § 55.14(3)(e).[9] By allowing for administration of psychotropic medication in a process closely monitored by the circuit court, ch. 55 permits full treatment of individuals with disorders like Alzheimer's Disease while restricting the liberty of the person only insofar as is strictly necessary. *See* § 55.14(3)(a-e).

---

[9] A person exhibits "substantial probability of physical harm, impairment, injury, or debilitation" if one of the following is true:

> [A] history of at least 2 episodes, one of which has occurred within the previous 24 months, that indicate a pattern of overt activity, attempts, threats to act, or omissions that resulted from the individual's failure to participate in treatment, including psychotropic medication, and that resulted in a finding of probable cause for commitment . . . ."

> Evidence that the individual meets one of the dangerousness criteria set forth in s. 51.20(1)(a)2. a. to e.

Wis. Stat. § 55.14(3)(e)1.-2.

¶ 19. In addition to the protective placement and services procedures outlined above, Wis. Stat. ch. 55 also provides for emergency services, if needed. *See* § 55.13. Upon filing of a petition for emergency services, the court must hold a preliminary hearing to determine whether probable cause exists to believe that the individual is a proper subject for protective placement or services under § 55.08.[10] *See* § 55.13(2). If the court determines that probable cause exists, it may order emergency protective services for up to 60 days, pending a final hearing pursuant to § 55.10, and may order the involuntary administration of psychotropic medication. *See* § 55.13(3); § 55.14(10).

¶ 20. Turning to Wis. Stat. ch. 51, that chapter, unlike ch. 55, has the principal purpose of "assur[ing] the provision of a full range of treatment and rehabilitation services . . . for all mental disorders and developmental disabilities and for mental illness, alcoholism and other drug abuse." § 51.001(1); *see also Rolo v. Goers,* 174 Wis. 2d 709, 721–22, 497 N.W.2d 724 (1993). Although the procedures for commitment in ch. 51 are similar to those contained in ch. 55, there are important differences in the elements the state must prove for each. In order to be subject to a ch. 51 involuntary commitment, a subject individual must meet three criteria: the subject individual must be 1) "mentally ill"; 2) "a proper subject for treatment"; and 3) "dangerous" to themselves or to others. § 51.20(1)(a)1.-2.; *cf.* Steven Erickson, et al., *Beyond Overt Violence: Wisconsin's Progressive Civil Commitment Statute as a Marker of a New Era in Health Law,* 89 Marq. L. Rev. 359, 368–71

---

[10] At this probable cause hearing, a petition for guardianship must accompany the petition for protective services if the individual does not already have a guardian. Wis. Stat. § 55.13(2).

(2005). A subject individual may be involuntarily committed under ch. 51 only when the county proves each of the elements above; therefore, if the circuit court determines that even one of the elements is not met, the subject individual may not be committed under ch. 51. *See* §§ 51.20(1)(a), (7)(c), (10)(c).[11]

## B. CHAPTER 55, NOT CHAPTER 51, IS THE APPROPRIATE MECHANISM FOR PROVIDING CARE FOR HELEN

¶ 21.   While Wis. Stat. chs. 55 and 51 have similar procedures, they serve substantially different purposes. Chapter 51 is designed to accommodate short-term commitment and treatment of mentally ill individuals, while ch. 55 provides for long-term care for individuals with disabilities that are permanent or likely to be permanent. *See* § 51.20(13)(g) (stating that a commitment under ch. 51 is not to exceed six months); § 51.20(1)(a) (stating that the individual subject to commitment must be a proper subject for treatment); § 55.08(1)(d) (stating that ch. 55 placement is allowed only where the individual to be protected suffers from "a disability that is permanent or likely to be permanent"). To that end, we turn to three specific differences between the chapters, ultimately holding that the procedures and protections provided by ch. 55 are a better fit for Helen and her particular disorder.

### 1. PLACEMENT

¶ 22.   First, if care were provided to Helen pursuant to Wis. Stat. ch. 55, rather than ch. 51, she could be

---

[11] Chapter 51 requires similar procedures for involuntary commitment, so we do not review the totality of those procedures here.

attended to with the fewest possible constraints on her freedom consistent with her own protection and the safety of the public. The balancing of those interests is required by both chapters, *see* Wis. Stat. § 55.001 (requiring placement with "the least possible restriction on personal liberty . . . ."); § 51.001 (stating that it is the purpose of the chapter to provide "the least restrictive treatment alternative appropriate to [the individual's] needs"), as well as by general principles of mental health law and constitutional jurisprudence. *Youngberg v. Romeo,* 457 U.S. 307, 321 (1982) (emphasizing "the proper balance between the legitimate interests of the State and the rights of the involuntarily committed to reasonable conditions of safety and freedom from unreasonable restraints.").

¶ 23. In the case of Helen, Wis. Stat. ch. 55 allows for a more appropriate balancing of these important interests than does ch. 51. For an individual committed under ch. 51 may be placed in *any* mental health unit without an additional finding by the circuit court, while under ch. 55, an individual may not be placed in units for the acutely mentally ill. This is an important distinction, because under the language of ch. 51, Helen, an 85 year-old Alzheimer's Disease patient, could be committed to a facility that tends to acutely mentally ill patients. *See* § 51.01(19) (" 'Treatment facility' means any publicly or privately operated facility or unit thereof providing treatment of alcoholic, drug dependent, mentally ill or developmentally disabled persons . . . ."). Thus, ch. 55 excludes certain facilities that Helen might otherwise be placed in pursuant to ch. 51. Because it is more narrowly tailored to her specific condition, and because it affords her additional process designed to ensure the appropriateness of her facility, we conclude that ch. 55 better balances Helen's interest

in liberty with the County's interest in protecting the public and in affording her the care she requires.

## 2. Guardian Ad Litem

¶ 24. Second, while Wis. Stat. ch. 51 does not provide for the appointment of a GAL, ch. 55 requires it. This is an important protection of the individual's interests that confirms our conclusion that ch. 55 is better suited to Helen's circumstances. § 55.10(4)(b) ("The court shall in all cases require the appointment of an attorney as guardian ad litem . . . ."). The appointment of a GAL ensures that individuals like Helen are provided adequate and specialized care, thus bolstering our determination that ch. 55 is the most appropriate means of providing care for Helen.

¶ 25. The legislature provided for the appointment of a GAL in Wis. Stat. ch. 55 proceedings because it recognized that individuals subject to the chapter need an additional advocate for their best interests, given that ch. 55 is focused on the provision of long-term care to individuals with incurable conditions. *See* § 55.195(1–9) (explaining the duties of the GAL); *see Jennifer M. v. Maurer*, 2010 WI App 8, ¶ 7, 323 Wis. 2d 126, 779 N.W.2d 436 (stating that a GAL provides "an advocate for the best interest of the ward.") A GAL is necessary because, in the context of Helen's Alzheimer's Disease, a ch. 55 protective placement is likely to extend for a much longer term than treatment in the ch. 51 context. *See* § 55.195(4) (stating that one of the GAL's duties under ch. 55 is to "[r]eview the annual report and relevant reports on the ward's condition and protective services."). Conversely, the goal of ch. 51 is to treat and rehabilitate the subject individual, which ideally ends by returning her to society. By contrast, ch. 55 is

designed for long-term management of disorders that cannot be treated, and therefore are unlikely to subside, meaning that the individual in need of protection is unlikely to return to society. Thus, periodic assessments by a GAL of the individual's situation are essential to the continual provision of appropriate care.

¶ 26.  In Helen's case, the appointment of a GAL would have served two purposes. Most importantly, a GAL would have been helpful in providing a recommendation to the court regarding Helen's need for protective services. Although Helen's appointed counsel also had Helen's best interests in mind, a GAL would have provided a second set of watchful eyes sensitive to Helen's needs at each step of the commitment process and on a regular basis after the issuance of a protective order. *See* Wis. Stat. §§ 55.10(b); 55.195(1–9).

¶ 27.  Additionally, a GAL would have provided the court with an individualized report regarding the provision of psychotropic medication, which the record reflects was a central component of Helen's care. Under Wis. Stat. ch. 55, a GAL must advise the court before he or she may order the involuntary administration of psychotropic medication whether that administration is in the best interest of the patient. *See* § 55.14(5). Further, the GAL must file periodic reports with the court outlining the need for continued protective placement and services, *see* § 55.18(2), and the need for continued involuntary administration of psychotropic medication, *see* § 55.19(2). In short, the GAL would have provided the court with advice as to Helen's best interest regarding psychotropic medication throughout the pendency—and continuance—of the protective placement under ch. 55. Such advice would have given the court valuable assistance in overseeing Helen's care with particular sensitivity to her unique needs. Because

the County utilized ch. 51, however, the court was forced to act without that helpful assistance.

¶ 28. Accordingly, the GAL requirement in Wis. Stat. ch. 55, and its absence from ch. 51, supports our conclusion that Helen should receive care pursuant to ch. 55.

### 3. REHABILITATION VERSUS LONG-TERM CARE

¶ 29. Finally, as we have already stated, the legislature designed Wis. Stat. ch. 55 to be used for long-term care, *see* § 55.08(1)(d) (stating that one of the requirements for protective placement is that "[t]he individual has a disability that is permanent or likely to be permanent."), while ch. 51 is used for short term treatment and rehabilitation intended to culminate with re-integration of the committed individual into society, *see* § 51.20(1)(a)1. (stating that the subject individual must be a proper subject for treatment).

¶ 30. In order to be a proper subject for treatment pursuant to an involuntary commitment under Wis. Stat. ch. 51, an individual must be capable of "rehabilitation." *See* § 51.01(17). We conclude that Helen is not a proper subject for treatment because while her Alzheimer's Disease may be managed, she is medically incapable of rehabilitation.

¶ 31. In reaching this conclusion, we are assisted by two decisions from the Wisconsin court of appeals. In one, the court decided that the subject individuals could not be rehabilitated, *see Milwaukee Cnty. Combined Cmty. Servs. Bd. v. Athans,* 107 Wis. 2d 331, 337, 320 N.W.2d. 30 (Ct. App. 1982), and in the other that the subject individual could be rehabilitated, *see C.J. v. State,* 120 Wis. 2d 355, 354 N.W.2d 219 (Ct. App. 1984).

These cases are instructive to our analysis of whether Helen is a proper subject for treatment under Wis. Stat. ch. 51, and whether ch. 55 or 51 is a more appropriate avenue for Helen's care. As with the statutory analysis above, this precedent confirms that ch. 55 better accommodates Helen's needs and those of the County.

### a. ATHANS

¶ 32. In *Athans,* the court of appeals found that Theodora Athans, a chronic paranoid schizophrenic, "was not a proper subject for treatment because rehabilitation in her case was not possible."[12] 107 Wis. 2d at 333. The physician who examined Athans, Dr. Kennedy, stated that he believed that she could be treated, but only in the sense that treatment involved long-term stabilization, or management of the disease. Brief for Respondents at 10, *Athans,* 107 Wis. 2d 331 (Nos. 81–1288, 81–1290). However, Dr. Kennedy further testified that attempted treatment of her underlying condition (or rehabilitation, as the court viewed it) would "have as much effect on her as water on a duck's back." *Id.* at 10.

¶ 33. Therefore, the court of appeals determined that Athans could not be rehabilitated, because it understood from the testimony of Dr. Kennedy that Athans "would not change her delusional scheme no matter what the treatment attempted, including seda-

---

[12] The *Athans* case actually involved two subject individuals: Athans, who suffered from chronic paranoid schizophrenia, and Haskins, who suffered from the compulsive disorder of pyromania. *Milwaukee Cnty. Combined Cmty. Servs. Bd. v. Athans,* 107 Wis. 2d 331, 333–34, 320 N.W.2d. 30 (Ct. App. 1982). The analysis in *Athans* of the second individual, Gerald Haskins, is not relevant to our discussion of the case.

tion." *Athans,* 107 Wis. 2d at 333. As a result, in the absence of any possibility of rehabilitation, the court concluded that Athans was not a proper subject for treatment. *See id.* at 333, 337.

### b. C.J.

¶ 34. Two years later, in *C.J.,* the court of appeals found that another individual also suffering from chronic paranoid schizophrenia was a proper subject for treatment because, unlike with Athans, rehabilitation was possible. 120 Wis. 2d at 356. In drawing this conclusion, the court of appeals relied upon the fact that treatment could help C.J., the subject individual, by effecting a change in his underlying disorder. *See id.* at 362.

¶ 35. In defending its conclusion, the court of appeals distinguished C.J. from Athans on several bases. It reasoned:

> The experts in *Athans* testified that neither of the persons named in the petitions was [a] proper subject for treatment. Furthermore, there was testimony in the case of the schizophrenic that her delusional scheme would not change no matter what treatment was tried and that hospitalization might actually be harmful. There can be little question that the expert testimony in *Athans* led to the trial court's finding that the two individuals, Athans and Haskins, were not proper subjects for treatment because these disorders could not be helped in any way.

*Id.* at 361 (internal citations omitted). The *C.J.* court went on to juxtapose the facts of *Athans* with the facts before it:

> We are satisfied that the *Athans* case involved two people who might be helped in terms of *maximizing*

> *their individual functioning and maintenance,* even
> though they could not be helped in controlling or
> improving their disorders. In this case, we have evi-
> dence that C.J. will benefit from treatment that will go
> beyond controlling his activity—*it will go to controlling
> his disorder* and its symptoms. As such, *Athans* is
> inapposite to this case.

*Id.* at 362 (emphasis added). Accordingly, the court of
appeals held that C.J. was capable of rehabilitation
because proper treatment had the potential to "con-
trol[] his disorder." *Id.*

■

¶ 36.   In so holding, the court of appeals provided
a useful and well-constructed fact-based test for deter-
mining whether a subject individual is capable of reha-
bilitation, and therefore treatable under Wis. Stat.
§ 51.01(17). If treatment will "maximize[e] the[] indi-
vidual functioning and maintenance" of the subject, but
not "help[] in controlling or improving their disorder[]," 
then the subject individual does not have rehabilitative
potential, and is not a proper subject for treatment.
*C.J.,* 120 Wis. 2d at 362. However, if treatment will "go
beyond controlling . . . activity" and will "go to control-
ling [the] disorder and its symptoms," then the subject
individual has rehabilitative potential, and is a proper
subject for treatment. *Id.* We believe the court of
appeals' test accurately reflects the interests embodied
in chs. 51 and 55, and we therefore bring it to bear in
the case at bar.

¶ 37.   Applying that test here, we conclude that
while the medical techniques employed in Helen's case
"maximiz[e] [her] . . . functioning and maintenance," as
was the case in *Athans,* those techniques are unfortu-
nately unlikely to rehabilitate her. Viewed in this light,
it is apparent that Helen's situation more closely mir-

rors Athans' than it does C.J.'s. This is so because, given the current state of medical science, Helen's Alzheimer's Disease is incurable and untreatable; the only available medical remedy is maintenance—not treatment—of the disease as it progresses. *See* Jinny Tavee & Patrick Sweeney, The Cleveland Clinic Foundation, *Current Clinical Medicine* 893 (William D. Carey, ed., 2d ed. 2010). Because Helen's Alzheimer's Disease is not treatable and medical techniques can only "maximiz[e] the[] . . . functioning and mainte-nance" of an individual, *C.J.,* 120 Wis. 2d at 362, we conclude that Helen cannot be rehabilitated within the meaning of Wis. Stat. ch. 51. By the plain terms of § 51.01(17) (requiring the subject individual to be ca-pable of rehabilitation), therefore, Helen cannot be cared for pursuant to ch. 51.

¶ 38.   There is, to be sure, some evidence that certain symptoms (anxiety and aggression) associated with Helen's Alzheimer's Disease may be ameliorated by psychotropic medication. Nevertheless, that fact does not alter the result, as there is uncontroverted evidence that Helen's underlying disorder, Alzheimer's Disease, as well as the vast majority of its symptoms, do not respond to treatment techniques designed to bring about rehabilitation. *See* Jinny Tavee & Patrick Sweeney, The Cleveland Clinic Foundation, *Current Clinical Medicine* 893 (William D. Carey, ed., 2d ed. 2010) (stating that temporary improvements may occur with medication, but no known cure for Alzheimer's Disease currently exists). In order for Helen to be a proper subject for treatment, the record would have to reflect, as it did in *C.J.,* "evidence that [the subject individual] will benefit from treatment that will go beyond controlling [her] activity—it will go to control-

ling [her] disorder and its symptoms." *C.J.,* 120 Wis. 2d at 362. In Helen's case, the only evidence on the point contained in the record is the testimony of Drs. Christenson and Rawski, who testified that while her activity may be managed, her disorder cannot be controlled. Therefore, *C.J.* is inapposite here, and Helen's condition must be considered untreatable and incurable. Accordingly, Wis. Stat. ch. 51, with its requirement that the individual be a proper subject for treatment, is ill-suited to her situation.

¶ 39. By contrast, Wis. Stat. ch. 55 contains no such requirement and thus imposes no such bar on Helen's care. Indeed, ch. 55 has the exact opposite objective: long-term care of people who will likely never be cured. Explaining that objective, the legislature noted in § 55.08(1)(d) that individuals in need of protective services are those who have "a disability that is permanent or likely to be permanent." Therefore, because Helen's disability is consistent with this purpose, in that it is not treatable given the current state of medical science, and therefore likely to be permanent, we believe that the procedures in ch. 55, not ch. 51, are appropriate.

¶ 40. We do not address whether an individual who has Alzheimer's Disease as well as a Wis. Stat. ch. 51 qualifying illness may be involuntarily committed under ch. 51. Instead, like the court of appeals, we "leave for another day the question of what is proper under the law when a person has a duel diagnosis of Alzheimer's and a Wis. Stat. ch. 51 qualifying illness." *Helen E.F.,* 333 Wis. 2d 740, ¶ 34 n.6. We trust the circuit court judges of our state to exercise their sound discretion in employing the powers assigned to them by ch. 51.

¶ 41.   In sum, Wis. Stat. ch. 55, unlike ch. 51, is better suited for Helen's situation because her Alzheimer's Disease is not treatable. Because ch. 55 provides additional processes and protections for Helen, it is better suited to her needs and those of the County. Accordingly, the circuit court was in error to proceed under ch. 51 and the court of appeals was correct to reverse and remand. We therefore must affirm.

## IV.   CONCLUSION

¶ 42.   We are asked to decide whether Helen E.F. ("Helen") may be involuntarily committed under Wis. Stat. ch. 51. After reviewing chs. 51 and 55, we hold that Helen is more appropriately treated under the provisions provided in ch. 55 rather than those in ch. 51. Because Helen's disability is likely to be permanent, she is a proper subject for protective placement and services under ch. 55, which allows for her care in a facility more narrowly tailored to her needs, and which provides her necessary additional process and protections. We conclude that Helen is not a proper subject for treatment because while her Alzheimer's Disease may be managed, she is not medically capable of rehabilitation, as required by the chapter. For these reasons, we agree with the court of appeals that Helen was improperly committed under ch. 51 and we therefore affirm.

*By the Court.*—The decision of the court of appeals is affirmed.

¶ 43.   DAVID T. PROSSER, J., did not participate.

¶ 44. SHIRLEY S. ABRAHAMSON, C.J. (*concurring*).   I agree that Chapter 55 of the Wisconsin Statutes appears to provide the proper procedural avenue

for Helen E.F. Chapter 55 is geared toward long-term care and protection, which is suitable for Helen E.F. Chapter 55 also features procedural mechanisms allowing for emergency detention and involuntary administration of psychotropic medication when either is necessary in specific circumstances. *See* Wis. Stat. §§ 55.12, 55.14.

¶ 45. I write separately for two reasons. First, I write to note some of the difficulties in interpreting Chapters 51 and 55. Despite the fact that the chapters ostensibly serve different purposes, there is substantial overlap and similarity between some aspects of the two chapters. It is a challenge, at times, to determine whether Chapter 51, 55, or both are available in a particular case.

¶ 46. Second, I write to highlight what I see as possible implications of the majority opinion. A wide and heterogeneous group of people is subject to Chapter 51, 55, or both. Throughout the chapters, the legislature seemingly attempted to categorize people, providing different procedures for different categories, such as people with "degenerative brain disorders," people with "developmental disabilities," people who are "mentally ill," and people who are "drug dependent." But the legislature also considers which procedural mechanisms are to be used based on the person's behavior, which does not necessarily hinge on the statutory category into which the person falls.

¶ 47. A tension exists in the texts of the statutes (and the application of the statutes) between on the one hand lumping together all people with a certain condition and on the other hand considering the symptoms and conduct of the individual. The tension between the more rigid categories of people with a certain condition and the more flexible behavioral standards is palpable

in the majority opinion. Does this opinion govern all Alzheimer's patients or only Helen E.F.?

¶ 48. The requirements for involuntary commitment under Wis. Stat. § 51.20 present an example of the tension and difficulty of interpreting Chapters 51 and 55. One requirement is that the individual be "mentally ill," "drug dependent," or "developmentally disabled." Wis. Stat. § 51.20(1)(a)1. The enumeration of specific categories suggests that the legislature intended to limit the reach of a provision and exclude certain categories of people. Yet, as Disability Rights Wisconsin argued in its non-party brief, the statute then furnishes a definition of mental illness for the purposes of involuntary commitment that "is so broad it can't be said to categorically rule out much of anything."[1]

¶ 49. Another requirement for involuntary commitment under Wis. Stat. § 51.20 is that the individual be "a proper subject for treatment," Wis. Stat. § 51.20(1)(a)1., which is defined to mean that "rehabilitation" must be possible for the individual. *See* Wis. Stat. § 51.01(17).

¶ 50. The two cases discussed by the majority opinion, *Athans* and *C.J.,* are illustrative of the malleability of the statutory definition of treatment and the

---

[1] *See* Wis. Stat. § 51.01(13)(b) (" 'Mental illness', for purposes of involuntary commitment, means a substantial disorder of thought, mood, perception, orientation, or memory which grossly impairs judgment, behavior, capacity to recognize reality, or ability to meet the ordinary demands of life, but does not include alcoholism.").

*See also* Wis. Stat. § 55.01(4m) (" 'Mental illness' means mental disease to the extent that an afflicted person requires care, treatment or custody for his or her own welfare or the welfare of others or of the community.").

tension inherent in the statutes between a defined category or condition and an individual's behavior.[2]

¶ 51. The individuals in the two cases suffered from the same condition—chronic paranoid schizophrenia—yet the two courts reached opposite results on the possibility of "rehabilitation." The results appear driven by the words chosen by expert medical witnesses describing the impact various medications would have on the individual.

¶ 52. The court of appeals in *Athans* concluded that the individual could not be rehabilitated; the court of appeals in *C.J.* determined that rehabilitation was possible for the individual involved. The court of appeals in *C.J.* saw a clear distinction between (a) a program capable of "maximizing . . . individual functioning and maintenance . . . [and] controlling . . . activity" (as described for the individual in *Athans*); and (b) a program capable of "controlling [a] disorder and its symptoms" (as described for the individual in *C.J.*).[3] In the court of appeals opinion, the former did not constitute rehabilitation, and the latter did. The line between the two does not seem so bright and clear to me. The difference may very well lie in the experts' framing of the effects of a treatment program.

¶ 53. These are just examples of the interpretive difficulties that arise in determining whether a person is subject to Chapter 51, 55, or both.

¶ 54. Today's majority opinion provides a potentially powerful tool for an individual seeking to avoid

[2] *See* majority op., ¶¶ 32–36 (discussing *Milwaukee County Combined Cmty. Servs. Bd. v. Athans,* 107 Wis. 2d 331, 320 N.W.2d 30 (Ct. App. 1982), and *C.J. v. State,* 120 Wis. 2d 355, 354 N.W.2d 219 (Ct. App. 1983)).

[3] *C.J.,* 120 Wis. 2d at 362.

involuntary commitment under Chapter 51. The broadest reading of the opinion would be that any person with an "incurable" condition may not be involuntarily committed under Wis. Stat. § 51.20. *See* majority op., ¶ 37. Individuals with conditions that might otherwise appear to qualify for involuntary commitment under the category "developmental disability"[4] may now argue that they are not proper subjects for "treatment" because their condition is incurable.

¶ 55. Although I agree with the result reached in the majority opinion, I am concerned that the opinion may have broad, unforeseen implications for many people who fall within the scope of Chapters 51 and 55 and for local governments.[5]

¶ 56. Because of the difficulties that arise in determining whether a person with a certain condition or a certain behaviors may be subject to Chapter 51, 55, or both, I suggest it may be time for the legislature to

---

[4] *See* Wis. Stat. § 51.20(1)(a)1. (establishing that a person with a developmental disability is potentially subject to involuntary commitment). *See also* Wis. Stat. § 51.01(5)(a) (defining "developmental disability" to include disabilities such as cerebral palsy, epilepsy, autism, Prader-Willi syndrome, and mental retardation); Wis. Stat. § 51.01(5)(b) (defining "developmental disability for purposes of involuntary commitment" to exclude cerebral palsy and epilepsy).

[5] The court received five non-party briefs in this case, which suggests that the case may have particularly broad impact. In favor of Helen E.F.'s position, we received briefs from Disability Rights Wisconsin, the Elder Law Section of the State Bar of Wisconsin and the Wisconsin Chapter of the National Academy of Elder Law Attorneys, and the Coalition of Wisconsin Aging Groups and Alzheimer's Association of Southeastern Wisconsin. In favor of the County, we received briefs from the Wisconsin Counties Association and the Wisconsin Association of County Corporation Counsels.

reassess the goals and intended scope of the two chapters. *See* Wis. Stat. §§ 13.83(1)(c)1., 13.92(2)(j).[6]

¶ 57.  For the reasons set forth, I write separately.

¶ 58.  I am authorized to state that Justice ANN WALSH BRADLEY joins this opinion.

---

[6] The Joint Legislative Council has established a Special Committee on Legal Interventions for Persons with Alzheimer's Disease and Related Dementias. "The Special Committee is directed to review and develop legislation to clarify the statutes regarding guardianship, protective placement, involuntary commitment, and involuntary treatment as they apply to vulnerable adults with a dementia diagnosis who may or may not have a co-occurring psychiatric diagnosis." *Summary of April 24, 2012 Joint Legislative Council Mail Ballot, available at* http://legis.wisconsin.gov/lc/committees/jointcouncil/files/2012/april24_summary_jlc_web.pdf (last visited May 14, 2012).