**COURT OF APPEALS**
**DECISION**
**DATED AND FILED**

**June 9, 2021**

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2020AP1744**

Cir. Ct. No. **2016ME141**

**STATE OF WISCONSIN**

**IN COURT OF APPEALS**
**DISTRICT II**

IN THE MATTER OF THE MENTAL COMMITMENT OF M.J.M.:

SHEBOYGAN COUNTY,

    PETITIONER-RESPONDENT,

  V.

M.J.M.,

    RESPONDENT-APPELLANT.

        APPEAL from an order of the circuit court for Sheboygan County: KENT R. HOFFMANN, Judge. *Affirmed*.

¶1 REILLY, P.J.[1] M.J.M. appeals from an order of the circuit court extending his involuntary commitment. He argues that Sheboygan County (the County) failed to establish that he is dangerous pursuant to WIS. STAT. § 51.20(1)(a), (am). We conclude that the evidence supports the circuit court's conclusion that M.J.M. is mentally ill, a proper subject for treatment, and would be a proper subject for commitment if treatment were withdrawn. *See* § 51.20(1)(a), (am). We affirm.

*Background*

¶2 The County petitioned to recommit M.J.M. in January 2020,[2] based on an evaluation by Samuel Weber, a case manager with Sheboygan County Health and Human Services. Weber recommended recommitment due to M.J.M.'s "[c]ontinued and persistent mental illness," "[p]ossible danger to self and/or others if not taking prescribed medication," and "[r]esistance to treatment when off [c]ommitment."

¶3 In March 2020, the circuit court held an extension hearing. Weber, Dr. Marshall Bales, M.D., and M.J.M. testified. We will recount the details of their testimony as necessary below. After reviewing the evidence and the arguments of the parties, the circuit court granted the County's request for an extension and entered the orders for the extension of the involuntary commitment

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2)(d) (2019-20). All references to the Wisconsin Statutes are to the 2019-20 version.

[2] M.J.M.'s previous order of commitment was due to expire on March 11, 2020.

and involuntary medication and treatment effective for one year.[3] M.J.M. appeals.[4]

*Involuntary Commitment and Standard of Review*

¶4 To involuntarily commit a person, a county must prove three elements by clear and convincing evidence: (1) the person is mentally ill, (2) the person is a proper subject for treatment, and (3) the person is dangerous pursuant to any of the five dangerousness standards enumerated in WIS. STAT. § 51.20(1)(a)2.a.-e. *See* § 51.20(1)(a)1.-2., (13)(e); ***Langlade County v. D.J.W.***, 2020 WI 41, ¶¶23, 29, 391 Wis. 2d 231, 942 N.W.2d 277; ***Fond du Lac County v.***

---

[3] M.J.M. does not present any arguments concerning the order for involuntary medication and treatment. We address it no further.

M.J.M. also sent a letter to the circuit court seeking a change of venue from Sheboygan County to Trempealeau County, which the circuit court denied. M.J.M. does not challenge the circuit court's ruling on appeal.

[4] The County argues on appeal that M.J.M.'s extension of commitment is moot, as that order has expired and there are no collateral consequences from this extension. Whether an issue is moot is a question of law that we review de novo. ***Marathon County v. D.K.***, 2020 WI 8, ¶16, 390 Wis. 2d 50, 937 N.W.2d 901. "An issue is moot when its resolution will have no practical effect on the underlying controversy." ***Id.***, ¶19 (citation omitted). An appeal of an expired commitment order might not be moot, however, if there are collateral consequences that persist after the order has expired. ***Portage County v. J.W.K.***, 2019 WI 54, ¶28 n.11, 386 Wis. 2d 672, 927 N.W.2d 509. Our supreme court has "previously concluded that an expired *initial* commitment order is moot," but where an individual remains "subject to the lasting collateral consequence of a firearms ban" after the order has expired, the expired commitment order is "not moot." ***D.K.***, 390 Wis. 2d 50, ¶¶22, 25 (emphasis added). Here, M.J.M. argues that he is subject to a firearm ban, which is a "serious collateral consequence associated with M.J.M.'s commitment," and that the "firearm ban does not terminate upon expiration of the commitment." M.J.M. also notes that the "stigma associated with an involuntary commitment," travel restrictions, and monetary liability are also collateral consequences of his commitment. The County argues that none of the collateral consequences addressed by M.J.M. stem from the extension of the commitment; instead, those consequences would remain as a result of the initial commitment, which is not under review. We note that our supreme court has granted the petition for review in ***Sauk County v. S.A.M.***, No. 2019AP1033, unpublished slip op. (WI App Sept. 3, 2020), wherein this court found S.A.M.'s challenge to a recommitment order moot under similar facts. We choose to reach the merits of this case.

*Helen E.F.*, 2012 WI 50, ¶20, 340 Wis. 2d 500, 814 N.W.2d 179. The circuit court may then extend the commitment for up to one year. Sec. 51.20(13)(g)1.; *Portage County v. J.W.K.*, 2019 WI 54, ¶¶17-18, 386 Wis. 2d 672, 927 N.W.2d 509. The same standards apply to extensions of the commitment, except the county may satisfy the showing of dangerousness by demonstrating "that there is a substantial likelihood, based on the subject individual's treatment record, that the individual would be a proper subject for commitment if treatment were withdrawn." Sec. 51.20(1)(am); *J.W.K.*, 386 Wis. 2d 672, ¶¶18-19.

¶5     Whether the county has met its burden in a commitment proceeding is a mixed question of fact and law. *D.J.W.*, 391 Wis. 2d 231, ¶24. We will uphold the court's findings of fact unless clearly erroneous. *Id.* Whether the facts in the record satisfy the statutory standard for recommitment, however, is a question of law that this court reviews de novo. *Id.*, ¶25.

*Sufficiency of the Evidence: Dangerousness*

¶6     M.J.M.'s primary argument on appeal is that the evidence presented by the County was insufficient to establish that he is dangerous.[5] Specifically, M.J.M. argues that "[n]o evidence of *recent* dangerous behavior was introduced at trial," and the circuit court's statement that "there doesn't need to be dangerous behavior evidenced during the commitment period for the extension" was "clearly contrary to the standard articulated in *J.W.K.*" We disagree.

---

[5] On appeal, M.J.M. does not challenge the findings that he is mentally ill and a proper subject for treatment. *See* WIS. STAT. § 51.20(1)(a)1.

¶7 WISCONSIN STAT. § 51.20(1)(am) recognizes that "an individual's behavior might change while receiving treatment" and, accordingly, "provides a different avenue for proving dangerousness if the individual has been the subject of treatment for mental illness immediately prior to commencement of the extension proceedings" as the individual "*may not have exhibited any recent overt acts or omissions demonstrating dangerousness* because the treatment ameliorated such behavior." ***J.W.K.***, 386 Wis. 2d 672, ¶19 (emphasis added). Thus, the County was not required to show that M.J.M. had demonstrated *recent* acts, omissions, or behaviors demonstrating dangerousness. As we have said before, in that way, § 51.20(1)(am) is an "alternative evidentiary path, reflecting a change in circumstances occasioned by an individual's commitment and treatment." ***J.W.K.***, 386 Wis. 2d 672, ¶19. "However, dangerousness remains an element to be proven to support both the initial commitment and any extension." ***Id.*** "The evidentiary pathway set forth by sub. (1)(am) 'acknowledges that an individual may still be dangerous despite the absence of recent acts, omissions, or behaviors exhibiting dangerousness outlined in § 51.20(1)(a)2.a-e.' but it 'does not change the elements or quantum of proof required.'" ***D.J.W.***, 391 Wis. 2d 231, ¶34 (quoting ***J.W.K.***, 386 Wis. 2d 672, ¶24).

¶8 We conclude that pursuant to WIS. STAT. § 51.20(1)(am), the County has established by clear and convincing evidence that there is a substantial likelihood that M.J.M. would be a proper subject for commitment if treatment were withdrawn. At the hearing, Dr. Bales testified that he met with M.J.M. by video conference for this current examination, but that he had met with him in person in 2016. Bales indicated that his findings were based on his review of the records from both Sheboygan and Trempealeau Counties, a review of his report from October 13, 2016, and conversations with M.J.M. as well as M.J.M.'s case

5

manager. According to Bales, M.J.M. has schizoaffective disorder with psychotic symptoms, which "grossly impair[s] [M.J.M.'s] judgment, behavior, and ability to meet the ordinary demands of life." Bales also noted that M.J.M. "has … antisocial traits, and that complicates his main problem of schizoaffective disorder" and "makes this whole situation all the more dangerous."

¶9      As to the subject of medication and treatment, Bales opined that M.J.M. is a proper subject for treatment and that prescribed medications are "therapeutic for him." According to Bales, however, M.J.M. "will not take medication," "will be noncompliant," and "will not pursue voluntary treatment," and if he stops medication he would decompensate. Bales testified that "the best way to measure future conduct is to look at past conduct and he has a long history of noncompliance, he said that he's paranoid of psychiatrists, and so … he will not take his medications without a medication order." He indicated that he discussed the advantages, disadvantages, and alternatives to medication or treatment with M.J.M. and opined that M.J.M. is "not adequately" able to express an understanding of them. Bales explained that M.J.M. "just doesn't think there is a problem," as he "said that he was not really ill, there's nothing wrong with him," and "[h]e points fingers at everybody else and he's sometimes violently so, very threateningly so."[6] In Bales' opinion, if M.J.M. was not subject to a commitment order, "he would stop taking his medications, withdraw from treatment, and subsequently decompensate" and "there's a substantial likelihood that he would again become a proper subject for commitment."

---

[6] M.J.M. has a history of being hostile toward his providers. For example, Bales explained that M.J.M. called "all of the doctors and staff" at Trempealeau County Health Care Center "quacks" and, on the record at the recommitment hearing, M.J.M. called Bales both a "freaking douchebag" and later a "lying douchebag."

¶10    Bales' testimony also shed light on how M.J.M.'s decompensation might manifest itself, based on his prior history of dangerous behavior. Bales testified that within the last year—while he was subject to the most recent commitment order—M.J.M. made "dangerous threats" over the phone against Weber[7] and another staff member at Winnebago Mental Health Institute, resulting in his removal from Winnebago to Trempealeau County Health Care Center. Bales testified that M.J.M. "left a voicemail for the case [manager] threatening to kill the case [manager] and [his psychiatrist]," and M.J.M. "admitted to making that verbal threat."[8] Bales also testified that this was not the first incident in which

_____

[7] Weber also testified at the hearing, indicating that he was the case manager that M.J.M. made threats against, and after the threatening voicemail, M.J.M. was assigned a different case manager. The remainder of his testimony addressed whether venue in Sheboygan County was proper.

[8] M.J.M. argues that "Dr. Bales and [the County] made much of M.J.M.'s telephone threats to kill his caseworker and psychiatrist. But those threats were made by phone, when M.J.M. was in a mental health crisis and was incarcerated in a lockdown psychiatric ward." According to M.J.M., any fear on the part of the case manager or the psychiatrist was not a "reasonable fear," as "threats made over the telephone with no possibility that they could be carried out cannot be said to create any 'reasonable fear' that M.J.M. could do 'serious physical harm' to the persons threatened." *See* WIS. STAT. § 51.20(1)(a)2.b. Further, M.J.M. argued that "the threats were made from afar and were not imminent," nor were they "recent," as they "were made on November 19, 2019," while the "hearing was held on March 5, 2020."

The County's point in response is well taken: the fact that M.J.M. was in a locked inpatient facility and could not easily act on his threats to kill his providers does not mean that his actions cannot satisfy the terms of the statute. Indeed, the fact that his commitment "ameliorated" some of his dangerous behavior ("by placing him in a locked inpatient unit so that he could not harm anyone") speaks to the basis for why WIS. STAT. § 51.20(1)(am) provides an "alternative evidentiary path." *See* **J.W.K.**, 386 Wis. 2d 672, ¶19. M.J.M. has also not presented any legal authority indicating that four months is not sufficiently "recent" under the statute. As stated above, however, § 51.20(1)(am) does not require recent behavior; regardless, we consider a threat made during the most recent commitment period to be "recent."

M.J.M. did note in his brief-in-chief that a "more recent threat to staff" was contained in Bales' report: during that incident, in January 2020, M.J.M. "was overheard by staff saying that when he is discharged, he is going to come back and 'shoot up this place.'" The County, however, did not introduce Bales' report into evidence, so we review only Bales' testimony at the hearing. *See* **Langlade County v. D.J.W.**, 2020 WI 41, ¶7 n.4, 391 Wis. 2d 231, 942 N.W.2d 277; **Winnebago County v. S.H.**, 2020 WI App 46, ¶2 n.3, 393 Wis. 2d 511, 947 N.W.2d 761.

7

M.J.M. had threatened violence, explaining that in October 2016 M.J.M. "admitted to all of those allegations[9] … and he was going to kill people. He was slightly psychotic. He was going to kill African Americans …."

¶11 M.J.M. also testified at the recommitment hearing. According to M.J.M., he was not suicidal, he did not want to harm himself, and he did not want to harm anyone else. When asked whether he would be willing to work with a doctor and take prescribed medication, he stated, "I have…. I'm working with a [doctor at Trempealeau] and I take every med she prescribes that she feels is right for me." He also expressed that he wishes to remain at Trempealeau so he may transition into a group home.

¶12 Based upon the above evidence, the circuit court found that the County had established that M.J.M. is dangerous pursuant to WIS. STAT. § 51.20(1)(am).[10] The court made the following findings of fact:

> Grounds for the extension—for the extension of the commitment have been established. The subject is mentally ill, he is dangerous as he evidences one or more of the standards under [WIS. STAT. §] 51.20, and I would point out the testimony has this threat that occurred just in November, which isn't that long ago. He's a proper subject for treatment, and I will make the finding that he is a resident of Sheboygan County.

---

[9] We assume "all of those allegations" refers to the allegations contained in Bales' report, which indicated that M.J.M. "said he would go to a cemetery and take all his pills to kill himself," that he had "killed himself 33 times," and that he "want[ed] to kill African Americans in Milwaukee."

[10] We note that the circuit court did not "make specific factual findings with reference to the subdivision paragraph of [WIS. STAT. §] 51.20(1)(a)2. on which the recommitment is based," *see D.J.W.*, 391 Wis. 2d 231, ¶59, but our supreme court's pronouncement on this issue, which came after M.J.M.'s hearing, is prospective, and, thus, does not apply to this case, *see id.* ("going forward"); *S.H.*, 393 Wis. 2d 511, ¶¶13-14. Both the County and M.J.M. appear to agree that § 51.20(1)(a)2.b. is the applicable dangerousness standard in this case; therefore, we will address the sufficiency of the evidence as it relates to that dangerousness standard.

The court agreed with the County that "there doesn't actually need to be dangerous behavior evidenced during the commitment period for the extension." According to the court, "[t]he analysis is whether—if treatment were withdrawn, would the person or the individual become a proper subject for commitment … and I do find Dr. Bales' testimony credible that if treatment were withdrawn [M.J.M.] would not take medications." While the court "commended" M.J.M. for his "significant progress," the court found that the level of treatment appropriate for M.J.M. was a locked inpatient facility based on Bales' credible testimony and that M.J.M. was "not yet today at that position where he can get into an outpatient facility at this moment."

¶13　We conclude that the factual findings of the circuit court were not clearly erroneous. M.J.M. faults the circuit court for its "acceptance of Dr. Bales' prediction that M.J.M. would stop taking his medication and would become dangerous if he were released from the commitment," noting that "Dr. Bales' statement contradicts numerous studies, as well as case law, recognizing the unreliability of predicting dangerousness." As we have stated before, however, "[d]angerousness in an extension proceeding [under WIS. STAT. § 51.20(1)(am)] can and often must be based on the individual's precommitment behavior, coupled with an expert's informed opinions and predictions," and we have frequently affirmed a court's finding of dangerousness pursuant to an expert's opinion based on precommitment behavior and rooted in the individual's treatment record. *See Winnebago County v. S.H.*, 2020 WI App 46, ¶13, 393 Wis. 2d 511, 947 N.W.2d 761; § 51.20(1)(am).

¶14　M.J.M. does not dispute that he is mentally ill and a proper subject for treatment. On the issue of M.J.M.'s dangerousness, we must consider whether Bales' testimony meets the standard for dangerousness under WIS. STAT.

9

§ 51.20(1)(a)2.b. "as viewed through the lens of § 51.20(1)(am)." *See **D.J.W.***, 391 Wis. 2d 231, ¶50. In other words, the testimony must provide sufficient evidence to support a conclusion that if treatment were withdrawn, "a substantial probability of physical harm to other individuals" would exist "as manifested by evidence of recent homicidal or other violent behavior, or by evidence that others are placed in reasonable fear of violent behavior and serious physical harm to them, as evidenced by a recent overt act, attempt or threat to do serious physical harm." *See* § 51.20(1)(a)2.b., (am); ***D.J.W.***, 391 Wis. 2d 231, ¶50.

¶15 Bales' testimony revealed that M.J.M. had made "recent" threats to kill his case manager and psychiatrist, which resulted in his removal from Winnebago to Trempealeau and the assignment of new treatment providers. Bales further testified that M.J.M. made similar threats against other groups in 2016. The court properly credited Bales' conclusion, based on M.J.M.'s treatment record, that if M.J.M. were not subject to a commitment order "he would stop taking his medications, withdraw from treatment, and subsequently decompensate" and "that there's a substantial likelihood that he would again become a proper subject for commitment." *See* WIS. STAT. § 51.20(1)(am). As the record on appeal supports this conclusion, the circuit court's findings of fact were not clearly erroneous, and our independent review indicates that the court properly found that M.J.M. is dangerous within the meaning of the commitment statute such that he "would be a proper subject for commitment if treatment were withdrawn." *See* § 51.20(1)(a)2.b., (am). We affirm.

*By the Court.*—Order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.