COURT OF APPEALS
DECISION
DATED AND FILED

September 6, 2023

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2022AP2065**

STATE OF WISCONSIN

Cir. Ct. No. 2020GN197

IN COURT OF APPEALS
DISTRICT II

---

IN THE MATTER OF THE GUARDIANSHIP AND PROTECTIVE PLACEMENT OF M.S.:

WAUKESHA COUNTY DEPARTMENT OF HEALTH AND HUMAN SERVICES,

PETITIONER-RESPONDENT,

V.

M.S.,

RESPONDENT-APPELLANT.

---

APPEAL from orders of the circuit court for Waukesha County: MICHAEL P. MAXWELL, Judge. *Affirmed*.

¶1 GUNDRUM, P.J.[1] Martin[2] appeals from an order of the circuit court granting Waukesha County Department of Health and Human Services' petition for protective placement and an order denying his postdisposition motion. He challenges the court's determination that the County met its burden "to establish that [Martin] is a proper subject for a protective placement under [WIS. STAT.] Chapter 55." For the following reasons, we affirm.

## *Background*

¶2 Martin's first psychiatric hospitalization occurred in 1978, and he lived under a WIS. STAT. ch. 51 commitment for approximately twenty-two years in connection with his paranoid schizophrenia. In January 2019, Martin was discharged from commitment, and he subsequently stopped taking his psychotropic medications. In the beginning of August 2019, Martin "was found to be confused/walking naked in the subdivision and ultimately became agitated with police and asked them to shoot him." Later that month Martin broke his ankle and refused the recommended surgery, "believing a tracking device would surgically be implanted in his leg."

¶3 In October 2019, Martin was emergently detained and then committed for six months under WIS. STAT. ch. 51 at Winnebago Mental Health Institute. After a transfer to another health care center and changes in his medication, his symptoms began to improve. In September 2020, Martin was able to move to a group home.

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2)(d) (2021-22). All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

[2] In lieu of using the initials M.S., we use the pseudonym "Martin."

¶4 In January 2021, the circuit court granted the County's petition to appoint a permanent guardian for Martin and his estate based upon his incompetency. Rather than continuing to petition to extend Martin's WIS. STAT. ch. 51 commitment, the County instead petitioned for his protective placement under WIS. STAT. ch. 55, which petition was granted by the circuit court in August 2021. Martin filed a postdisposition motion challenging the determination that he was a proper subject for protective placement, which motion the circuit court denied. Martin appeals that denial. Additional facts are included below as appropriate.

## *Discussion*

¶5 The circuit court in this case entered an order for protective placement of Martin pursuant to WIS. STAT. ch. 55. In his brief-in-chief "Statement of the Issues," Martin identifies the issue for our review as "[d]id Waukesha County meet its burden to establish that [Martin] is a proper subject for a protective placement under chapter 55?" To resolve this issue, we must determine if the evidence presented at the hearing on the County's protective placement petition was sufficient to establish that Martin is a proper subject for protective placement.

¶6 Unfortunately, Martin gets off track early in this appeal, spending his entire appellate briefing effort attempting to convince us that his circumstance would be more appropriately considered under WIS. STAT. ch. 51 instead of WIS. STAT. ch. 55. Rather than going fishing for this red herring, we stay focused on the issue Martin correctly identified at the start—"[d]id Waukesha County meet its burden to establish that [Martin] is a proper subject for a protective placement under Chapter 55?" If the evidence presented at the hearing satisfies the

requirements for protective placement under ch. 55, then we must affirm the circuit court. Whether the County could have appropriately filed yet another petition under ch. 51—or whether the ch. 51 approach might be a "more appropriate" action—is not before us and not a matter for us to dwell on. Which path to pursue—ch. 55 or ch. 51—is an executive decision made by the County, not the courts. The role of the courts is to decide whether the County satisfied its burden under its chosen path. Either of the two approaches may be appropriate under the statutes, and our job is not to make a judgment call as to whether the County should have continued Martin's commitment pursuant to ch. 51 but to determine whether the County presented sufficient evidence to the circuit court from which it could properly enter a protective placement order for Martin under ch. 55. Thus, we will address the issue appropriately identified by Martin at the start.[3]

¶7    A circuit court's findings of fact will not be overturned unless clearly erroneous. *K.N.K. v. Buhler*, 139 Wis. 2d 190, 198, 407 N.W.2d 281 (Ct. App. 1987). "The issues of whether the evidence satisfies the legal standard for incompetency and whether the evidence supports protective placement are questions of law, which we review *de novo*." *Coston v. Joseph P.*, 222 Wis. 2d 1, 23, 586 N.W.2d 52 (Ct. App. 1998).

---

[3] Martin relies quite heavily upon our supreme court's decision in *Fond du Lac County v. Helen E.F.*, 2012 WI 50, 340 Wis. 2d 500, 814 N.W.2d 179. While that case is informative as to various matters related to WIS. STAT. chs. 51 and 55, at the end of the day, the *Helen E.F.* court's decision was that Helen was "improperly committed under ch. 51" because she was not "a proper subject for treatment [under that chapter] because … she [was] not medically capable of rehabilitation, as required by" ch. 51. *Helen E.F.*, 340 Wis. 2d 500, ¶42. Here, Martin was protectively placed pursuant to a petition under ch. 55. Again, here we do not review an order related to a decision on a ch. 51 petition.

4

¶8      Pursuant to WIS. STAT. § 55.08(1), a circuit court may order protective placement for a person who meets all the following:

> (a) The individual has a primary need for residential care and custody.
>
> (b) The individual … is an adult who has been determined to be incompetent by a circuit court.
>
> (c) As a result of developmental disability, degenerative brain disorder, serious and persistent mental illness, or other like incapacities, the individual is so totally incapable of providing for his … own care or custody as to create a substantial risk of serious harm to himself … or others. Serious harm may be evidenced by overt acts or acts of omission.
>
> (d) The individual has a disability that is permanent or likely to be permanent.

We conclude the County met its burden with regard to each requirement.

¶9      We first look at whether the County established the first and third requirements, which have commonalities, at the hearing on the petition. We have stated that the language "primary need for residential care and custody," related to the first requirement, means the subject of the petition "must have a primary need (1) to have his or her daily needs provided for in a residential setting; and (2) to have someone else exercising control and supervision in [his or her] residential setting for the purpose of protecting the person from abuse, financial exploitation, neglect, and self-neglect." *Jackson Cnty. Dep't of Health & Hum. Servs. v. Susan H.*, 2010 WI App 82, ¶16, 326 Wis. 2d 246, 785 N.W.2d 677. We also have explained that the terms "care" and "custody" as used in the third requirement respectively refer to whether "the person's incapacity to provide for his … daily needs creates a substantial risk of serious harm to the person or others" and "the person cannot provide for himself … the protection from abuse,

5

financial exploitation, neglect, and self-neglect that the control and supervision by others can provide." *Id.*, ¶17.

¶10    In its determination that the County had established the requirements of WIS. STAT. § 55.08(1), the circuit court relied heavily upon the report and hearing testimony of psychologist Dr. Peder Piering.  According to Piering's report and/or testimony, he had provided evaluations related to Martin since 2006, primarily in connection with WIS. STAT. ch. 51 petitions.  His prior evaluations were based on reviews of Martin's records because Martin consistently refused to meet face-to-face with Piering until the night before the WIS. STAT. ch. 55 hearing at issue in this appeal.  Piering's report, admitted into evidence at the hearing, was based upon Piering's review of Martin's records as well as his meeting with Martin.

¶11    According to Piering, Martin has been hospitalized ten times for psychiatric reasons, the first time in 1978.  When his commitment was discontinued in 1994, Martin "went off his medications requiring 3 hospitalizations until he was recommitted again in 1996."  Related to a 1996 hospitalization, Martin "was ED'd [emergently detained] as he fought with police after they confronted him for riding his bike erratically on a state highway."  Piering repeatedly noted Martin's history of medication noncompliance and indicated that when he is off his medication, he has "become violent, paranoid, guarded and has displayed poor judgment."

¶12    Martin was on commitment for twenty-two years before his last commitment period expired in January 2019.  He stopped taking his medication thereafter and in early August 2019 "he was found to be confused/walking naked

6

in the subdivision and ultimately became agitated with police and asked them to shoot him." Piering's report also indicated that around this time, Martin

> was at [Community Memorial Hospital] for a broken ankle and … was refusing all medical treatment/surgery or to take his medications. He believed his food was poison and his thoughts were not reality based. He was responding to auditory hallucinations and was considered nonsensical/disorganized. He has been verbally aggressive with staff. He is unable to care for himself. He had not taken his psychiatric medications since 8/27/19.

¶13 In early October 2019, Martin "was transferred to WMHI [Winnebago Mental Health Institute] for ongoing agitation/paranoia and noncompliance." According to Piering's report, he "was uncooperative upon eval and refused to speak to staff"; "has been isolating to his room and yelling for everyone to get out"; refused to eat at times and "continued to refuse vitals"; would not allow x-rays or treatment for his broken ankle; refused oral Haldol "but does accept the Haldol IM [intermuscular] replacement"; would occasionally "strik[e] out"; "remains paranoid/guarded, delusional, with occasions of hallucinations and at risk/aggressive behaviors/ideations with impaired cognition"; "remains on Q15min safety checks and has required time in the seclusion room"; and "is considered paranoid." Piering's report also indicates Martin

> began to respond to treatment in 2/2020 but required a back up IM until 5/2020 *due to noncompliance with treatment*…. He had also *required* delay and reapproach *to maintain compliance*. He has been compliant with and benefitted from medication *management* since admission to his current placement in 9/2020. He attends his medical appointments *with assist*. He continues to want to return home but this is not available to him as the home is considered uninhabitable…. He continues to want to change the dose of his oral medications and insight is considered inconsistent.
>
> .…

In addition to assistance and oversight with his ADLs [activities of daily living] he continues to receive medication *management* and his medical/mental health treatment *is coordinated for him*. Despite his symptoms being managed by medications he remains incapable of understanding his limitations. He is unable to process information or appreciate the consequences of his decision. His insight and judgment are significantly impaired. He continues to state a desire to return to his home. If his CH 51 is dismissed in August 2021 it is believed he will elope from Cedar Ridge AFH and will return to his home despite it being in a continued state of disrepair. *He is totally incapable of providing for his own care and custody and it creates a substantial risk of harm to himself and others*.

Staff reports he continues to have occasional outbursts regarding his desire to return home and *he continues to have occasional refusals to take his medications or swallow them*. His home remains uninhabitable …. *He has denied any mental illness*.… He continues to exhibit paranoia and accuses others of stealing from him.

This extension period he has *continued to express he does not need medication* and that he wants to be off them…. He has continued to refuse necessary documents to maintain appropriate placement. *He continues to lack insight into his mental illness and need for medications*. Despite *his ongoing resistance to taking his medications* he has benefited from this and has been psychiatrically more stable with absence of violent/aggressive behavior.

….

… *He has a lengthy history of not being compliant with his medications and refusing medical treatment*…. *Despite his symptoms being managed he remains incapable of understanding his limitations*. He is unable to process information and understand the consequences of his actions/decisions. His insight and judgment are significantly impaired. His mental health issues are chronic and have rendered him incompetent and in need of a guardian of Person/Estate…. Paranoid delusions towards all authority figures and toward his mental health difficulties reported…. [H]e refused to sign any paperwork [for his transfer] as "it is fraudulent and filled with lies". He has also refused to follow up with a medical provider, open a bank account, and he refuses to sign paperwork to pursue medicare/medicaid. He has continued to refuse signing paperwork and wants to return home. Staff report

his insight remains limited. He is passively compliant with medications….

….

*… He does not believe he is mentally ill or that he needs medications. He believes the medications are poison and that they make him ill and caused his heart attack.*

Since his last commitment symptoms of irritability, hostility, poor insight, and paranoia have been evident throughout. *He takes no initiative with respect to his treatment and is generally resistant. He continues to believe he does not require medications and blames many limitations in his life on this. He denies any mental illness.* He has not seen his psychiatrist since June and he is supposed to see him every 4 months.

(Emphasis added.)

¶14    In his report, Piering indicated Martin suffers from mild to moderate impairment of his memory and moderate impairment of his reasoning. Related to his memory, Piering noted that Martin's recall is particularly inadequate "when addressing his own psychiatric history." As to reasoning, Piering wrote that Martin

denied any history of psychosis, mood issues, inability to care for self, noncompliance with medical/psychiatric medications/recommendations, or at risk behaviors/ideations or he would make statements such as "water under the bridge, insignificant, all in the past, rather not say…. I get 20mg and I want 5 to 10mg, she blew me off, take whatever I can, whatever they prescribe to get back home." When addressing side effects of medications he states "42 various side effects, I don't have that sheet, I itemized them, tingling, pain, and numbness, I'd have to dig it up and read it off the sheet."

Martin further indicated he would go back to his house if he could.[4]  Piering further wrote that Martin "reportedly lacks adequate comprehension, understanding, and appreciation of his psychiatric condition and needs."

¶15    Related to "executive functioning," Piering indicated Martin is mildly to moderately impaired and added that he "is able to respond adequately to simple questions addressing abstract reasoning, problem solving, reasoning though he is unable to apply this same ability to his own situation.  He is unable to make decisions in his own best interest."

¶16    In the report, Piering also checked boxes indicating Martin does not "adequately understand and appreciate the nature and consequences" of his impairment; is permanently incapacitated; suffers from "serious and persistent mental illness," specifically chronic schizophrenia.  Piering indicated that Martin's condition interferes with his ability to "receive and evaluate information," "use information in a decision process," "communicate decisions," "protect himself … from abuse, exploitation, neglect or rights violation," "meet [the] essential requirements of his … health and safety," "manage his … property and financial affairs," "address risk of properly being dissipated in whole or in part," "provide for his … own support," and "prevent financial exploitation."  Piering elaborated:

> [Martin] can not sufficiently comprehend, keep track of, or reason about property/financial information in order to make informed decisions in his own best interest.  He can not comprehend, appreciate, or evaluate health care decisions, alternative treatments, and personal care custody.  He is not competent.  He is mentally incapable of providing for his own care and custody.  He requires a guardian.  If left on his own, he will be unable to exercise adequate judgment or make rational decisions to the extent that he

_____

[4]  Various documents in the record suggest Martin's house has already been sold.

> will neglect his needs and suffer potential harm to himself, deterioration in his medical condition, and potentially death.

Related to medications, Piering indicated that Martin does not have "the evaluative capacity to … consent to medical examination and treatment, and consent to voluntary medication, including psychotropic medication that is in [his] best interests [or] consent to the involuntary administration of a medical examination, medication other than psychotropic medication, and medical treatment that is in [his] best interests."

¶17 Specifically related to protective placement, Piering checked boxes indicating that Martin "require[s] placement in a licensed, certified or registered setting," his incapacity "render[s] him[] so incapable of providing for his[] own care or custody as to create a substantial risk of serious harm to himself[] or others," and his incapacity is "permanent or likely to be permanent." Piering also checked boxes indicating Martin needs "24 hour supervision" and "a secure setting with monitored egress," adding that his placement at that current time was appropriate.

¶18 During his meeting with Martin the day before the hearing, Martin made comments such as

> they took my money, stole my bank account, I'm not a dirt bag, *millions murdered by the court*, all this manipulation, the judges the psychiatrists, video court is unconstitutional. I'm not nuts, you are stonewalling me, they give me 2 to 4 times the normal dose, I need Dr. Jody to reduce it by a small amount. I handle my business myself thank you.

(Emphasis added.)

¶19 Not surprisingly, Piering's testimony at the hearing the day after writing his report largely mirrored that report. He noted that when Martin "was

11

taken off commitment back in 1994 and again in 2019, he goes off his medications, stops the injection and deteriorates." Martin has "a baseline paranoia. That paranoia seems to get[] worse [when he deteriorates]. He lacks insight into any medical needs which occurred in 2019. He has experienced auditory hallucinations, has believed that his food is poisoned. He has violent behaviors as well in terms of striking out at others." Martin's paranoia "led to his refusal or his resistance to follow through [with] paperwork that he was being asked to address," and Piering agreed that Martin's paranoia "also contributed to his inability to make decisions regarding his own medical care." Piering also agreed that if Martin went off of his psychotropic medications, he would "experience similar difficulties in the future."

¶20 When Martin

> attempt[s] to address his mental illness, he'll either deny it, [or] he'll say he was wrongly diagnosed…. [H]e doesn't accept [his paranoid schizophrenia] diagnosis. When attempting to address his history of symptoms, he's unwilling or unable to do that…. [W]hen asked directly about his symptoms he's had in the past, he denies them.

Piering agreed that Martin's mental illness is chronic and "[p]ersistent and serious." Piering explained that "if he's not protectively placed, if he doesn't have that ongoing consistent structure, ongoing consistent supervision, access to orientation and encouragement to follow through with medications, I believe that he would become further paranoid, become more resistant to treatments, not be able to meet his everyday needs." There is "a baseline level of paranoia there, but without protective placement, I believe that that paranoia increases. He ultimately refuses, doesn't follow through with treatment and deteriorates."

12

¶21    Piering testified that Martin's thinking is unrealistic in regards to his ability to return to his home due to its being "uninhabitable." While Martin acknowledged to Piering that "some things need to be addressed" in his home, he was "unable to say how he's going to go about making that happen, how he's going to pay for these things."

¶22    Piering expressed safety concerns, saying

> if he were not in protective placement, I don't believe he'd follow through with his medications. [Social worker] Rachel Leonhard has told me that they really depend on that structure, that supervision. They don't think if he's not in that setting that he would follow through with his medications anymore. If he does not follow through with his meds, he has a history of violent behavior. He has a history of suicidal ideation. I believe those would be issues.

Piering further indicated he did not believe Martin "would be able to make decisions regarding his own medical care, for example, if he got injured." Piering agreed Martin has a primary need for residential care and custody and "his incapacities render him so incapable of providing for his own care and custody as to create a substantial risk of serious harm to himself or others."

¶23    On cross examination, Piering indicated that while he doesn't know just how quickly Martin would deteriorate if he stopped taking his medication, he "know[s] that it would happen." He agreed that Martin's desire to move back into his house was "a motivator for currently taking his medication."

¶24    Of note, Piering testified that even if Martin's home was habitable, he would hold the same opinion regarding Martin's ability to return home, adding that there are no "services that could be provided [to Martin] that would allow him

to live in his home." He expressed his concern that Martin would not take his medication, and even "med monitoring … would not alleviate that concern."

> In [Martin's case] … and … other cases similar to this one, when people are in a structured environment, they're provided supervision, encouragement to follow through with ADL's, encouragement to follow through with med management, and they're provided that structure 24-7. They're able to follow through with med management even though there's still paranoia there.
>
> When people like [Martin] and in other cases that I've seen similar cases when they're allowed to go home and they have their own personal space, their resistance gets stronger, their paranoia can be stronger. So I think with respect to his lack of insight and the benefit for his medications, even though he's compliant, I believe that increases when he returns home, and ultimately he'll refuse meds and not follow through and deteriorate.

Piering added that in Martin's case, "I believe it's really the structure and the 24-hour placement that makes a difference for him" because of "his baseline paranoia. If he is allowed to go back to his own home, I believe that will increase[]. I believe his resistance increases." Piering agreed that his main concerns are that without protective placement, Martin will not follow through with medications and "what happens after he doesn't follow through."

¶25 Piering elaborated on this last point on redirect examination:

> It's just having other individuals around you that are tuned into reality, tuned into what's happening around them. He's able to benefit from that which may and I believe does prevent him from going any further into any paranoia, any more paranoid thought. It gives him a different perspective other than just his own.

¶26 While Piering's evidence alone more than sufficiently supports the circuit court's protective placement order in this case, there was more. The guardian of Martin's estate testified that "[t]he water [in Martin's house] cannot be

14

turned on because the plumbing is in such a bad state of disrepair" and would need to be "completely replaced before it would work." She also testified that Martin had received a notice of violations from the town "for exposed wood, holes in the home, delaminated garage service door, deteriorating accessory building and … unkempt lawn and premises." The guardian also testified that Martin receives only $650 per month[5] and at the time of the hearing, she only had $31 at her disposal and was unable to pay any of Martin's bills. Additionally, at the time of the hearing, Martin owed over $4,000 in delinquent property taxes and the house had liens against it totaling $69,022.75.

¶27 The evidence easily establishes that Martin "has a primary need for residential care and custody" as he is very likely to stop taking his medication and decompensate to the point of creating serious risk for himself and/or others if he is removed from the structured, supportive environment he is currently in and attempts to go back to his apparently uninhabitable home that he does not appear to be capable of making habitable. But even if he could make it habitable, we agree with Piering's concerns that there are no "services that could be provided [to Martin] that would allow him to live in his home," because Martin is unlikely to take his medication, and even "med monitoring … would not alleviate that concern." In relation to the third requirement, the evidence further shows that as a result of his chronic paranoid schizophrenia, Martin "is so totally incapable of providing for his … own care or custody as to create a substantial risk of serious harm to himself … or others." *See* WIS. STAT. § 55.08(1)(c). Martin's long history demonstrates he does not believe he has a mental illness, does not believe

---

[5] The record suggests this amount comes from social security.

he needs medication, is resistant to taking necessary medications, and is very unlikely to continue taking them without a structured, twenty-four seven environment like the one he is currently in. The evidence further shows that if he does not continue taking his medication, he will decompensate and "create a substantial risk of serious harm to himself or others."

¶28 As to the second requirement of WIS. STAT. § 55.08(1)—"[t]he individual … is an adult who has been determined to be incompetent by a circuit court"—the circuit court determined this was met because of its incompetence finding in January 2021, in connection with the petition for guardianship of Martin and his estate. Martin develops no challenge to this requirement on appeal, so we need say no more about it.

¶29 As to the fourth requirement of WIS. STAT. § 55.08(1)—"[t]he individual has a disability that is permanent or likely to be permanent"—the evidence establishes that Martin has been diagnosed with paranoid schizophrenia for decades, has been subject to a WIS. STAT. ch. 51 order for a significant portion of that time period, and had his first of at least ten psychiatric hospitalizations in 1978. Piering indicated Martin's condition is "permanent," "chronic" and "persistent." Martin develops no challenge in relation to this requirement, and we understand why, as it is fully supported by the evidence. The evidence presented by the County satisfied all four requirements for a protective placement order.

¶30 This case bears significant similarities to the one before us in *K.N.K.*, 139 Wis. 2d at 197. The question in that case was whether the evidence related to K.N.K., who had been suffering from chronic schizophrenia for seventeen years at the time of the filing of the protective placement petition, established substantially the same four requirements as to her that are at issue in

the case now before us. *See id.* As we explained it, "K.N.K.'s doctors have continuously prescribed medication with some encouraging results when K.N.K. has taken the medication. However, the record indicates that K.N.K. has a spotty history of complying with her medication prescriptions. The record also indicates that once K.N.K. stops taking her medication, she reverts into a delusional state." *Id.* at 195-96. Also very similar to the current case, K.N.K., "on several occasions, ha[d] been found to be mentally ill and dangerous and ha[d] been committed for treatment pursuant to [WIS. STAT.] ch. 51," and the circuit court there had found her "to be a limited incompetent and appointed a guardian over her person and estate." *K.N.K.*, 139 Wis. 2d at 196.

¶31 As to the "primary need" requirement, K.N.K. asserted, as we wrote it, "if anything, the evidence only indicates that her primary need is for active treatment with psychotropic medication under [WIS. STAT.] ch. 51." *K.N.K.*, 139 Wis. 2d at 200. We disagreed, noting that

> K.N.K.'s debilitation lies in her mental illness which is rendered permanent because of her continuing inability or refusal to address it or assist in treating it. It is this history which demonstrates, more than any other fact, that K.N.K. requires more than active treatment under ch. 51 … and that K.N.K. has now progressed to the point where her primary need is for protective placement. Under K.N.K.'s argument, she could be perpetually involved in the ch. 51 commitment system and never be subject to a [WIS. STAT.] ch. 55 … placement.

*K.N.K.*, 139 Wis. 2d at 201-02. We could nearly substitute "Martin" for "K.N.K." in this paragraph as he too has an established history of resistance to and avoidance of medication that, while not eliminating his paranoia, lessens it so he is not such a risk to himself or others.

¶32     Related to the "substantial risk of serious harm" requirement, we stated in **K.N.K.** that "the harm envisioned may not be based on mere speculation but must be directly foreseeable from the overt acts or omissions of the individual." **Id.** at 202.  K.N.K. asserted "that the only foreseeable harm indicated by the evidence was the 'prospect of deterioration without forced medication.'" **Id.** at 203.  We noted in response that the evidence showed that K.N.K. had a

> "pattern" [of] refrain[ing] from ingesting her medication when not forced to do so and slip[ping] back into a delusional state.  The evidence also indicated that once K.N.K. reverted back to a delusional state, serious harm was directly foreseeable in that her delusions have, in the past, placed her and others in direct risk of serious harm.

**Id.**  We pointed out various seriously dangerous conduct she engaged in when off medication, and we considered her past history "to be a reliable prediction of the foreseeable harm which may result if she were not subjected to protective placement." **Id.**  Here too, Martin engages in seriously dangerous behavior when not taking his medication:  (1) he drove his bicycle erratically on a state highway and then fought with law enforcement; (2) he "was found to be confused/walking naked in the subdivision and ultimately became agitated with police, … ask[ing] them to shoot him"; and (3) he broke his ankle and refused the recommended surgery, "believing a tracking device would surgically be implanted in his leg."

¶33     For the preceding reasons, we conclude that the County met its burden to show that protective placement is appropriate for Martin, and we affirm the orders of the circuit court.

> *By the Court.*—Orders affirmed.

This opinion will not be published.  *See* WIS. STAT. RULE 809.23(1)(b)4.