**COURT OF APPEALS**
**DECISION**
**DATED AND FILED**

**September 11, 2024**

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

**Appeal No.** **2024AP759-FT**

**STATE OF WISCONSIN**

Cir. Ct. No. 2020GN21

**IN COURT OF APPEALS**
**DISTRICT II**

IN THE MATTER OF THE GUARDIANSHIP AND PROTECTIVE PLACEMENT OF S.S.

OZAUKEE COUNTY,

  PETITIONER-RESPONDENT,

 V.

S. S.,

  RESPONDENT-APPELLANT.

APPEAL from an order of the circuit court for Ozaukee County: SANDY A. WILLIAMS, Judge. *Affirmed.*

¶1 NEUBAUER, J.[1] S.S., referred to herein by the pseudonym Samuel, appeals from an order continuing his protective placement under WIS. STAT. § 55.18(3)(e)1. Samuel argues that Ozaukee County (the "County") did not prove by clear and convincing evidence that he continues to meet the statutory requirements for protective placement. For the reasons that follow, this court affirms.

## BACKGROUND

¶2 Samuel was first ordered into protective placement in May 2020. His placement was continued in 2021 and 2022 following annual reviews required under WIS. STAT. § 55.18. In April 2023, the County filed a petition for a third annual review of Samuel's placement status. As he had previously, Samuel contested the petition and so the circuit court held a full due process hearing. At the end of the hearing, the court concluded that the County had met its burden of proof and entered an order continuing his protective placement. This 2023 order is the subject of Samuel's appeal.

¶3 To provide context for the relevant facts, this court provides a brief overview of the standards and procedures that govern protective placements under WIS. STAT. ch. 55. Chapter 55, which "is focused on the provision of long-term care to individuals with incurable conditions," allows a circuit court to order protective placement for an individual if four criteria are met. *Fond du Lac County v. Helen E.F.*, 2012 WI 50, ¶¶14, 25, 340 Wis. 2d 500, 814 N.W.2d 179. Specifically, protective placement may be ordered if an individual: (1) "has a

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2)(d) (2021-22). All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

primary need for residential care and custody"; (2) "has been determined to be incompetent by a circuit court"; (3) "is so totally incapable of providing for his or her own care or custody as to create a substantial risk of serious harm to himself or herself or others" due to "developmental disability, degenerative brain disorder, serious and persistent mental illness, or other like incapacities"; and (4) "has a disability that is permanent or likely to be permanent." WIS. STAT. § 55.08(1)(a)-(d).

¶4   Protective placements "massive[ly] curtail[]" an individual's personal liberty and can also "engender adverse social consequences." *Vitek v. Jones*, 445 U.S. 480, 491-92 (1980) (citations omitted). Thus, the legislature has mandated that they be administered "to place the least possible restriction on personal liberty and exercise of constitutional rights consistent with due process and protection from abuse, financial exploitation, neglect, and self-neglect." WIS. STAT. § 55.001.

¶5   One way in which Chapter 55 gives effect to this statutory purpose is by requiring that an individual's placement status be reviewed annually. *See* WIS. STAT. § 55.18. As part of an annual review, a county must evaluate the "physical, mental and social condition of the individual and [his or her] service needs." Sec. 55.18(1)(a). The county must also file a report of the evaluation, which becomes "part of the permanent record of the individual." *Id.* After the report is filed, the circuit court must appoint a guardian ad litem for the individual. Sec. 55.18(2). The guardian ad litem must review the individual's placement and file a report setting forth the guardian ad litem's views on "whether the individual appears to continue to meet the standards for protective placement … and whether the protective placement is in the least restrictive environment that is consistent with the individual's needs." Sec. 55.18(2)(a)-(f). The court must also, if the

individual requests, order an independent evaluation of his or her "physical, mental, and social condition" and "service needs." Sec. 55.18(3)(b)3.

¶6    Where, as here, an individual contests continued placement, the circuit court must hold a hearing to determine whether the individual continues to meet the four statutory criteria. WIS. STAT. § 55.18(3)(d). At the hearing, the county must prove that the individual continues to meet those criteria by clear and convincing evidence. *See id.*; *see also* WIS. STAT. § 55.10(4)(d); ***Douglas County v. J.M.***, No. 2022AP2035, unpublished slip op. ¶18 (WI App Nov. 28, 2023).[2] If the court orders that protective placement be continued, it must "include in the order the information relied upon as a basis for the order and shall make findings based on the standards under [WIS. STAT. §] 55.08(1) in support of the need for continuation of the protective placement." Sec. 55.18(3)(e)1.

¶7    Before turning to the facts, this court must address a disagreement between the parties concerning the scope of this court's review. The record includes not only the reports and testimony generated in connection with the 2023 annual review at issue in this case, but also reports, hearing transcripts, and other documents related to Samuel's initial protective placement in 2020 and the annual reviews conducted in 2021 and 2022. The parties disagree about whether this court must limit its analysis to the materials related to the 2023 annual review or whether it may also consider reports and documents related to the 2020-2022 placements.

---

[2] Though unpublished, this court's opinion in ***Douglas County v. J.M.***, No. 2022AP2035, unpublished slip op. (WI App Nov. 28, 2023), may be cited for persuasive value. *See* WIS. STAT. RULE 809.23(3)(b).

¶8 The County argues that this court may consider past reports and documents, citing in support our unpublished opinion in *J.M.* There, this court stated that "all reports and documents that have been admitted into evidence in the individual's prior protective placement proceedings may be relied upon, in addition to any witness testimony introduced during the individual's due process hearing." *J.M.*, No. 2022AP2035, ¶20. Samuel disagrees, arguing that reliance on materials related to prior protective placements conflicts with our supreme court's decision in *State ex rel. Watts v. Combined Community Services Board of Milwaukee County*, 122 Wis. 2d 65, 83, 362 N.W.2d 104 (1985). There, the court recognized that an "individual's incompetence, need for residential care and custody or risk of harm may change with time" and held that individuals in protective placement were "entitled to the right of periodic, automatic judicial review that all other civilly committed persons in Wisconsin have." Samuel contends that this right "would be hollow if the court is permitted to rely solely on past reports and documents to determine whether protective placement should be continued."

¶9 Samuel's argument is not well-taken. To be sure, an annual review of an individual's protective placement focuses on whether they currently satisfy the four criteria in WIS. STAT. § 55.08(1), not whether they did so at some point in the past. But that focus on an individual's present needs, capabilities, and condition does not render evidence from prior placement proceedings that concerns those issues irrelevant. Protective placement under WIS. STAT. ch. 55 focuses on individuals with long-term and, in some cases, incurable conditions. *See Helen E.F.*, 340 Wis. 2d 500, ¶25. Reports, testimony, and other documents from prior proceedings that contain opinions from qualified medical professionals and other information about an individual's condition and needs can be relevant to

5

a circuit court's analysis of an individual's present status and whether the individual continues to meet the requirements for protective placement. Consideration of this evidence is not contrary to *Watts'* recognition that protectively placed individuals are entitled to have their placement status reviewed periodically. And as this court noted in *J.M.*, an individual may attack evidence from prior proceedings by "request[ing] an independent evaluation under WIS. STAT. § 55.18(3)(b)3. [or] call[ing] his or her own witnesses" to show "that the [prior] opinions … are stale or that the placed individual's underlying conditions or needs have materially changed." *J.M.*, No. 2022AP2035, ¶21. Accordingly, this court will not exclude from its analysis the reports and hearing testimony related to Samuel's past protective placements.

## I.     Prior Protective Placements

¶10    In April 2020, the County filed petitions for protective placement and guardianship over Samuel. A report filed by the County stated that Samuel, who had been living with his elderly mother, had been emergently placed because he "was unable to care for himself and his mother was no longer able to meet his needs." The report noted Samuel's "long history of alcohol abuse" and described him as "intoxicated constantly" and as having memory problems, delusions, paranoia, and being verbally and emotionally abusive towards his mother. The report also described injuries Samuel had sustained as the result of multiple falls at his mother's home and noted that he "had not taken any of his prescribed medications, including seizure medications, since sometime prior to moving into his mother's home." The County recommended protective placement at a skilled nursing facility based on the following:

> [Samuel] has an extensive history of alcohol related problems. Cognitive deficits have been noted for years.

> [Samuel]'s ongoing alcohol abuse has caused him to neglect his health and basic needs, and has led to a further deterioration of his cognitive functioning. At this time, [Samuel] is incapable of managing for his own care and safety. [Samuel] remains disoriented and forgetful. He does not have insight into his current needs. He requires assistance with basic activities of daily living.

A court-appointed guardian ad litem agreed with the County's recommendation.

¶11 A report prepared by a psychologist who examined Samuel noted that his "[m]edical history [was] significant for chronic alcohol abuse, esophagitis, gastritis, hyperlipidemia, lung cancer, and unspecified seizure with alcohol." The report also stated that a "CT of [Samuel's] head showed generalized cerebral and cerebellar atrophy and chronic white matter disease." The report described Samuel as "not eating properly, taking his medications, or able to care for himself." The psychologist diagnosed Samuel with "Alcohol-related persisting dementia" and opined that he met the four statutory requirements for protective placement.

¶12 The circuit court held a hearing at which the psychologist testified that Samuel's ability to make decisions and care for himself was unlikely to improve given Samuel's then-current level of cognitive functioning and years of alcohol abuse. The court found Samuel to be incompetent due to a "degenerative brain disorder" and "other like incapacities," appointed a guardian for him, and ordered protective placement.[3]

¶13 The County filed a petition for annual review of Samuel's protective placement in April 2021, along with the statutorily required annual report of his

---

[3] The Honorable Paul V. Malloy entered the orders placing Samuel in protective placement and appointing a guardian.

condition. At that time, staff at the facility where Samuel lived assisted him in managing his medications and making meals. The report described Samuel as continuing to engage in problematic behaviors such as scheduling medical appointments without staff knowledge, threatening and falsely accusing staff, and stealing items from the medication cart. He also reportedly broke into a staff office and "attempted to break into other residents['] room[s]." Because Samuel was "continuously causing problems" at the facility, staff recommended he be moved to a "smaller home" which could provide needed "supervision for [his] safety."

¶14 The circuit court ordered an independent evaluation of Samuel. The psychologist who performed the evaluation submitted a report setting forth her opinion that he continued to meet the statutory criteria for guardianship and protective placement. The report recounted Samuel's family history of mental illness, his "long history of severe alcohol abuse" and associated "chronic health issues," and incidents of disruptive and aggressive behavior at several care facilities during his first year in protective placement. It summarized the psychologist's interview of Samuel, identifying as "[n]oteworthy … his denial and minimization of problems or behaviors that could place him in a negative light" and his "deni[al of] any history whatsoever of alcohol abuse and alcohol-related medical issues." The psychologist also noted that although Samuel had "shown significant improvement in basic [activities of daily living], ambulation and overall cognition, his adjustment ha[d] continued to be hindered by behavioral disturbance and lack of insight into his serious alcohol condition that led to his present legal situation."

¶15 Based on the information summarized in the report, the psychologist diagnosed Samuel with mild neurocognitive disorder with behavioral disturbance,

severe alcohol use disorder, and unspecified bipolar and related disorder. In terms of his then-current functioning, she wrote that

> [Samuel]'s self-report was unreliable and discrepant with prior collateral sources and current data. He denied or minimized behaviors, including alcohol abuse, that led to his present situation. He flatly denied any alcohol-related functional impairment or alcohol-related medical issues. Striking was his inflated self-image and blame of others for his predicaments…. [Samuel] displayed a serious lack of insight into the alcohol-related basis for his hospitalization, his complicated withdrawal, encephalopathy and identified medical conditions associated with his alcohol use. Though aware of his seizure disorder, he disclaimed ever having seizures during alcohol withdrawal. He dismissed the accuracy of collateral data, challenged the reliability of the source, and persisted in demanding proof.

In concluding that Samuel's guardianship should be continued, the psychologist wrote that "[h]is condition is likely to remain permanent … though the course of his recovery is difficult to predict with certainty as improvement in behavior/mood can be more stubborn than for cognition." With respect to protective placement, she opined that there "continue[d] to be clear and convincing evidence that [Samuel] is so incapable of providing for his own care and custody as to create a substantial risk of serious harm to himself and others." Of import to this opinion, she noted Samuel's "lack[ of] insight into his serious alcohol abuse," which presented an "elevated risk" that his alcohol use would increase if he were not supervised and lead to "financial mismanagement, self-neglect and serious biomedical complications."

¶16 The circuit court held a hearing in August 2021 at which it heard testimony from the psychologist, Samuel, and his guardian ad litem. The court concluded that Samuel met the requirements for continued protective placement

but ordered that he be housed in a less restrictive environment given the "great strides" he had made since his emergency placement.[4]

¶17    In February 2022, the circuit court granted a petition filed by the County to modify Samuel's placement from the supervised apartment in which he had been living back to a locked facility. The change was prompted by Samuel's consumption of alcohol in his apartment, which led to him falling and becoming verbally aggressive towards others. Samuel's case manager also testified that he had not been fully compliant in taking his medications or attending medical appointments. His guardian ad litem agreed that he needed to move "to a facility that can manage his behavior … and keep[] him abstaining from alcohol." Based on this testimony, the court concluded that continued "protective placement is appropriate and modification to a locked unit is absolutely necessary for him."[5]

¶18    In March 2022, the County filed another petition to continue Samuel's protective placement. Once again, the circuit court ordered an independent evaluation per Samuel's request. The examining psychologist filed a report reviewing Samuel's extensive placement history, prior diagnoses, and the psychologist's impressions from his interview with Samuel. The psychologist noted mild or moderate impairments in orientation, sensory/motor function, communication, and memory along with severe impairments in reasoning, executive functioning, and emotional/behavioral functioning. The psychologist also opined that Samuel's "most appropriate diagnosis at this time appears to be

---

[4] The Honorable Steven M. Cain signed the August 2, 2021 order continuing Samuel's protective placement.

[5] Judge Cain signed the order modifying Samuel's placement to a locked facility.

alcohol induced neurocognitive disorder, amnestic-confabulatory type, alcohol use disorder, and unspecified bipolar disorder." He explained that Samuel's impairments interfered with his ability to perform tasks necessary to function independently:

> His lack of insight and recognition of past and ongoing concerns as well as his identified neurocognitive challenges secondary to his alcohol use impact his ability to effective[ly] evaluate information and to use it effectively in a decision making process. These deficits also impact his ability to manage his property and finances effectively and to meet[] essential requir[e]ments for health and safety or provide for his own support.

The psychologist agreed that Samuel's incapacity rendered him "so incapable of providing for his[] own care or custody as to create a substantial risk of serious harm to himself[] or others" and recommended that he continue to be placed in a locked setting with round-the-clock supervision. Samuel's guardian ad litem agreed with that recommendation. After a hearing in June 2022, the circuit court granted the County's petition.[6]

## II.    The 2023 Annual Review

¶19    The County filed a third petition to continue Samuel's protective placement in April 2023 along with an annual report of his condition. The report was authored by Julie Schlehlein, who works for the County as an adult protective services supervisor.

¶20    In her report, Schlehlein listed Samuel's prior diagnoses as including "[b]ipolar disorder, personality disorder, post-traumatic stress disorder, anxiety

---

[6] Judge Cain entered the June 20, 2022 order continuing Samuel's protective placement.

disorder, mild cognitive impairment, alcohol dependence with other alcohol-induced disorder" and "history of traumatic brain injury." She listed him as "Independent" in the areas of eating, dressing, toileting, mobility, and transfers but noted that his caregivers had to complete other tasks for him, including meal preparation, shopping, housekeeping, laundry, and medication management. She described Samuel as "relatively physically able" and requiring "minimal support/supervision for some activities of daily living" but noted that he "has frequent and repetitive health concerns," "does not always retain information (explanations, appointment information, etc[.]) that is given to him," and "is often frustrated that his health care is not addressed in the timeframe or manner that he wishes."

¶21     With respect to Samuel's mental condition, Schlehlein checked boxes in the report next to the following descriptions:

- "Does not fully recognize/understand his/her needs"

- "Requires supervision for safety and well-being"

- "Demonstrates impaired decision-making abilities (insight, judgment, and/or reasoning)"

- "Refuses necessary support or assistance for care needs"

- "Is an elopement/wandering risk"

- "Displays verbally or physically aggressive behavior"

- "Engages in self-injurious or other dangerous behavior"

- "Requires support to regulate mood or behavior"

The report also relayed comments from a social worker at Clearview, the facility at which Samuel resided, that he "continues to struggle with unit rules" and "demonstrates inappropriate behavior." Schlehlein also wrote that Samuel has

attempted to assert control over his finances and medical care in a manner that has impaired his guardian's ability to do so and that he "continues to make efforts to circumvent his [g]uardian's authority over his [p]erson and [e]state." The report concludes with the views of Samuel's guardian and case manager that his placement in a secure unit should be continued. Schlehlein testified at the hearing, consistent with her report, that Samuel's protective placement should be continued at the same level of restriction.

¶22     The County's other witness, Leah Staiduhar, is a social service specialist at Clearview who has worked with Samuel since his admission in April 2022.[7] She testified that Samuel receives medication three times per day but has not taken sufficient responsibility for administering it because he does not always "seek out the nurse" to obtain it. With respect to meal preparation, she testified that Samuel "has a history of unsafe food practices," such as leaving milk out until it curdled. Samuel is unable to grocery shop or prepare his own meals because he lives in a locked portion of the facility. She testified that Clearview coordinates Samuel's medical appointments to make sure he sees the appropriate providers and that Samuel would, "[i]f left to his own," schedule excessive appointments and "seek out additional providers."

¶23     Staiduhar also testified about other aspects of Samuel's behavior. According to her, Samuel tries to "wander[] off" and "exit the household … roughly ten to fifteen times per quarter." She explained that Samuel is supervised when he leaves Clearview because "[h]e lacks self-awareness and safety" and

---

[7] Staiduhar, who has a master's degree in professional counseling, was the only witness at the June 2022 hearing on Samuel's 2022 extension of placement.

"would likely acquire things that can put both himself as well as peers and staff in danger." For example, when he goes to a medical appointment, Samuel will "rummage[] through cabinets" and try to steal office supplies and medical supplies—"pretty much anything that's not fixed down that he can get his hands on." Staiduhar also testified that Samuel has "verbal outbursts" as often as "every couple of days," adopts a "posturing" stance at times in which he clenches his fists and appears as if he is "looking to strike and/or get physical with somebody," and often threatens staff that he will sue them or "call local authorities" if he does not get his way. She described one incident in December 2022 in which Samuel was upset at a perceived delay in staff providing his medication and injured himself by hitting his head on a door frame "numerous times." Staiduhar testified further that Samuel can be a positive or negative influence towards his peers "depend[ing] on his mood" and that he had recently destroyed a DVD belonging to someone else.

¶24 Staiduhar described Samuel as having "a great sense of humor and … an amazing ability to debate topics." But she did not believe that anything had improved for him in the past year and that he continued to struggle with memory problems and "lack of insight into his current mental health conditions."

¶25 Samuel's guardian ad litem also filed a report recommending continued protective placement. Her report summarized Samuel's history in protective placement, including his transfer in 2021 to a less restrictive setting, his subsequent "struggles with mental health and AODA issues," and later transfer to a more restrictive locked unit. The circuit court appointed a psychologist to independently evaluate Samuel, but her report is not in the record and neither party called her as a witness at the hearing.

¶26 At the conclusion of the hearing, the circuit court concluded that the "County ha[d] met its burden and that the protective placement … at Clearview is the least restrictive" placement option for Samuel. The court subsequently entered an order memorializing its findings that Samuel met the four statutory requirements for protective placement, including that he suffers from a "degenerative brain disorder" and "other like incapacities" that render him so unable to care for himself "as to create a substantial risk of serious harm to [himself] or others."

## DISCUSSION

¶27 This court reviews a protective placement order under a mixed standard of review. A circuit court's factual findings are reviewed deferentially and will not be set aside unless they are clearly erroneous. WIS. STAT. § 805.17(2). "A finding of fact is clearly erroneous if it is against the great weight and clear preponderance of the evidence." *Metropolitan Assocs. v. City of Milwaukee*, 2018 WI 4, ¶62, 379 Wis. 2d 141, 905 N.W.2d 784. This court reviews de novo the legal question whether the evidence meets the requirements for continued protective placement. *Coston v. Joseph P.*, 222 Wis. 2d 1, 23, 586 N.W.2d 52 (Ct. App. 1998).

¶28 Samuel challenges the circuit court's order on two grounds. First, he argues that the County did not meet its burden of proof because it did not present testimony from a medical expert that he met the four statutory requirements for protective placement. He cites in support *Walworth County v. Therese B.*, 2003 WI App 223, ¶13, 267 Wis. 2d 310, 671 N.W.2d 377, in which this court stated that "the government must present a witness who is qualified by experience, training and independent knowledge of [an individual]'s mental health to give a

15

medical or psychological opinion on each of [the requirements.]" Samuel contends that neither witness presented by the County was "a mental health expert …. qualified to testify whether [he] met the standards to continue protective placement."

¶29 The County contends that Samuel forfeited this argument by failing to raise it in the circuit court. *See* *State v. Huebner*, 2000 WI 59, ¶10, 235 Wis. 2d 486, 611 N.W.2d 727 ("Issues that are not preserved at the circuit court … generally will not be considered on appeal."). Samuel disagrees, arguing that his counsel's argument at the hearing that the County had not presented evidence to establish that he has a disability that is, or is likely to be, permanent, was sufficient to preserve the issue because permanency is a point for which expert testimony is required.

¶30 This court need not decide whether counsel's argument was sufficient to preserve the issue Samuel raises for appeal, because even if it was, the argument fails on its merits. Samuel points to no statute requiring testimony from a medical professional in a continued protective placement proceeding, and the case on which he relies, *Therese B.*, is materially distinguishable from the present case.

¶31 *Therese B.* involved an appeal from a protective placement and the establishment of a guardianship. This is significant because, as this court observed in *J.M.*, "[a] medical opinion *is* required for the appointment of a guardian, but there is no such corresponding requirement for a continued protective placement order." *J.M.*, No. 2022AP2035, ¶23. Specifically, WIS. STAT. § 54.36(1) provides that when a guardianship is sought, "a physician or psychologist, or both, shall examine the proposed ward and furnish a written report stating the physician's or

psychologist's professional opinion regarding the presence and likely duration of any medical or other condition causing the proposed ward to have incapacity." In contrast, the statutory provision that governs annual reviews of protective placements requires a county to prepare a "written evaluation of the physical, mental and social condition of the individual and the service needs of the individual," WIS. STAT. § 55.18(1)(a), but no language in that provision or the provision providing for an annual hearing "even suggests that the reviewer or any testifying witness must have medical expertise." *J.M.*, No. 2022AP2035, ¶23. Samuel points to no other legal authority requiring testimony from a medical professional at each annual review hearing.

¶32 Samuel's other argument is that the County failed to establish the third statutory criterion for continued protective placement—that he suffers from "developmental disability, degenerative brain disorder, serious and persistent mental illness, or other like incapacities" that render him "so totally incapable of providing for his … own care or custody as to create a substantial risk of serious harm to himself." *See* WIS. STAT. § 55.08(1)(c). In making this argument, Samuel discusses only the testimony of Staiduhar and Schlehlein and the annual report prepared by Schlehlein in connection with the 2023 annual review of his placement status. But as this court has concluded, it is also appropriate to consider reports, testimony, and other items in the record from Samuel's initial protective placement in 2020 and the annual reviews in 2021 and 2022. Considering those additional materials, this court concludes that sufficient evidence exists in the record to establish the third criterion.

¶33 Since his initial protective placement, Samuel has been diagnosed by multiple psychologists with alcohol-related disorders and other serious mental health conditions. The psychologist who examined him in 2020 diagnosed him

with "Alcohol-related persisting dementia," which he identified as an "[o]ther like incapacit[y]" for the purpose of WIS. STAT. § 55.08(1)(c). The psychologist also noted that a CT scan of Samuel's brain revealed "generalized cerebral and cerebellar atrophy and chronic white matter disease," conditions that involve damage to, or loss of, brain tissue. The following year, a different psychologist diagnosed Samuel with mild neurocognitive disorder, severe alcohol use disorder, and unspecified bipolar and related disorder. She opined that his condition, though "difficult to predict with certainty," was "likely to remain permanent." In 2022, Samuel was evaluated by a third psychologist who diagnosed him with "alcohol induced neurocognitive disorder, … alcohol use disorder, and unspecified bipolar disorder." Samuel requested, and was granted, an independent examination in 2023, but a report of that examination was not filed with the circuit court. Nonetheless, there is nothing to suggest that the opinions of the psychologists who previously examined Samuel have grown stale over time or that the alcohol-related and other disorders have materially improved or resolved such that they no longer constitute "degenerative brain disorder[s], serious and persistent mental illness[es], or other like incapacities" for the purpose of § 55.08(1)(c).

¶34 The record also supports the conclusion that Samuel's long-standing mental health issues continue to render him "so totally incapable of providing for his … own care or custody as to create a substantial risk of serious harm to himself … or others." WIS. STAT. § 55.08(1)(c). Samuel was protectively placed in 2020 after his chronic alcohol abuse left him with significant cognitive impairments and unable to care for himself and take prescribed medications. The psychologist who examined him that year testified that his impaired ability to care for himself and make decisions was unlikely to improve, even if he stopped abusing alcohol.

Since that time, medical professionals and care providers have consistently described Samuel as having issues with memory and decision-making, lacking insight into his issues with alcohol, and neglectful of his health and basic needs. On the one occasion in 2021 when Samuel's placement was changed to a less restrictive environment, he was ordered back into a locked facility within six months because he had resumed drinking which led to him falling and becoming verbally aggressive towards others.

¶35    The impairments and issues that prompted Samuel's protective placement in 2020 continue to impair his ability to care for himself.  In her April 2023 report, Schlehlein noted that Samuel was able to complete some activities of daily living with minimal or no supervision or assistance, but also that (1) he continues to require supervision for his safety and well-being; (2) his decision-making continues to be impaired; (3) he is verbally and physically aggressive towards others and "[e]ngages in self-injurious or other dangerous behavior"; and (4) he is unable to control his mood and behavior.  Schlehlein's report also described Samuel's efforts to circumvent his guardian by making health care and financial decisions without the guardian's knowledge or consent.  In addition, Staiduhar testified that Samuel remains unable to assume responsibility for taking his medications, frequently attempts to leave the Clearview facility where he resides, engaged in self-injurious behavior when his medications were not, in his view, distributed timely, and continues to lack insight into his mental health conditions.  In focusing on portions of the 2023 annual report and hearing testimony that address behaviors he considers merely annoying or relatively minor, Samuel ignores the larger, years-long record of his time in protective placement, which establishes that he continues to lack the ability care for himself

and function independently and that he continues to pose a substantial risk of serious harm to himself or others.

¶36     Though this court concludes that the record supports the circuit court's order continuing Samuel's protective placement, it notes that the court's oral ruling and its written order issued are not entirely consistent in identifying the specific portions of the record on which it relied in finding that Samuel continued to meet the statutory criteria for protective placement. In its oral ruling, the court concluded that the County had met its burden based on the testimony presented at the hearing. In the written order, however, the court's findings were made "[a]fter consideration of the reports and other documents on file, all factors required by the statutes, and such additional information presented." This discrepancy is noteworthy because if a circuit court determines that continued protective placement is appropriate, it must "include in the order the information relied upon as a basis for the order." WIS. STAT. § 55.18(3)(e)1. Given this statutory directive, a circuit court ordering continued protective placement should, as stated in *J.M.*, "explain on the record that it is basing its findings, at least in part, on previously admitted documents within the record or prior adjudicative facts, and also explain why and how it is doing so." *J.M.*, No. 2022AP2035, ¶28. Making a more complete record as to those portions of the record upon which the court's decision is based will ensure compliance with WIS. STAT. § 55.18(3)(e)1. and facilitate appellate review of protective placement orders.

*By the Court.*—Order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.